280 F.3d 124
 In re VISA CHECK/MASTERMONEY ANTITRUST LITIGATION.
Wal-Mart Stores, Inc., Limited, Inc., Sears Roebuck & Company, Safeway Inc., Circuit City Stores, Inc., National Retail Federation and the Food Marketing Institute, International Mass Retail Association, and All Similarly Situated Persons, Plaintiffs-Appellees,
v.
Visa U.S.A. Inc. and Mastercard International Incorporated, Defendants-Appellants.
 Docket No. 00-7699.
 United States Court of Appeals, Second Circuit.
 Argued February 5, 2001.
 Decided October 17, 2001.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Steven V. Bomse, Heller Ehrman White & McAuliffe LLP, San Francisco, CA (M. Laurence Popofsky, Marie L. Fiala, Brian P. Brosnahan, Renata M. Sos, Adam Cole, Heller Ehrman White & McAuliffe and Philip H. Curtis, Robert C. Mason, Arnold & Porter, New York, NY, on the brief), for defendant-appellant Visa U.S.A. Inc.
 Kenneth A. Gallo, Clifford Chance Rogers & Wells LLP, New York, N.Y. (James N. Benedict, Mark A. Kirsch, Guy C. Quinlan, Craig M. Walker, Joseph J. Simons, Keila D. Ravelo, on the brief), for defendant-appellant MasterCard International Incorporated.
 Lloyd Constantine, Constantine & Partners PC, New York, N.Y. (Robert L. Begleiter, Matthew L. Cantor, Stacey Anne Mahoney, Wendy M. Rogovin, Amy N. Roth, Gordon Schnell, Mitchell C. Shapiro, Jeffrey I. Shinder, Michael Spyropoulos, Constantine & Partners PC and Steve W. Berman, George W. Sampson, Jim Solimano, Hagens Berman LLP, Seattle, WA, on the brief), for plaintiffs-appellees.
 Jack C. Auspitz, Debra Freeman, Morrison & Foerster LLP, New York, N.Y. (Geoffrey P. Miller, of counsel) filed a brief Amici Curiae for The American Bankers Association, The Consumer Banks Association, The Financial Services Roundtable, and The New York Bankers Association.
 Before JACOBS, SOTOMAYOR, Circuit Judges, and COTE, District Judge.*
 Judge JACOBS, dissents in a separate opinion.
 SOTOMAYOR, Circuit Judge:
 
 
 1
 Defendants-appellants Visa U.S.A. Inc. ("Visa") and MasterCard International Incorporated ("MasterCard") appeal from an order of the United States District Court for the Eastern District of New York (Gleeson, J.) granting plaintiffs-appellees' ("plaintiffs") motion for class certification. We hold that the district court did not abuse its discretion by finding that plaintiffs had established that this action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3). We therefore affirm.
 
 BACKGROUND
 
 2
 Plaintiffs — a number of large and small merchants and three trade associations — bring this antitrust class action against defendants Visa and MasterCard, alleging that defendants have created a tying arrangement in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by means of their "honor all cards" policy, which requires stores that accept defendants' credit cards to accept their debit cards as well. Plaintiffs also allege that defendants have attempted and conspired to monopolize the debit card market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.
 
 
 3
 The underlying facts are drawn from plaintiffs' Second Amended Consolidated Class Action Complaint. Although Visa and MasterCard are separate associations, their rules permit "duality," which allows banks to be members of both associations and to issue both brands of credit cards. There is a 95 percent overlap between Visa's and MasterCard's memberships, and virtually every retailer that accepts one of defendants' credit cards also accepts the other's credit cards. Additionally, as a result of the duality policy, Visa and MasterCard coordinate many of their policies.
 
 
 4
 Visa and MasterCard, through member banks, issue different types of payment cards, including credit cards and debit cards. Member banks, called card-issuing institutions, rather than defendants themselves, issue payment cards to consumers and set the cardholders' interest rates and fees. Other member banks, called acquiring institutions, contract on behalf of Visa and MasterCard with retailers to accept their payment cards. When a cardholder makes a purchase with his or her Visa or MasterCard payment card at a merchant's store, the acquiring institution reimburses the merchant the purchase price less a "discount fee" and the acquiring institution pays the card-issuing institution an "interchange fee."[1] The interchange fee is set by Visa and MasterCard, and the discount fee is based largely on the interchange fee.[2] Plaintiffs allege that, because of defendants' policy of duality, there is a high degree of uniformity in both the interest rates and fees charged by defendants' member banks to cardholders and in the discount rates charged by defendants' member banks to merchants accepting Visa and MasterCard payment cards.
 
 
 5
 This action centers around a class of debit cards issued by Visa and MasterCard. A debit card is an access device which enables a cardholder, among other things, to withdraw cash from his or her bank account at an automated teller machine and to make purchases at a point of sale ("POS") which are debited against the cardholder's bank account. POS debit card transactions can either be "on-line" or "off-line." In an on-line debit card transaction, the cardholder enters his or her "personal identification number" ("PIN") into a PIN pad and then, during the retail transaction, the card-issuing institution verifies that there are sufficient funds in the cardholder's account and electronically puts a hold on the funds needed for the transaction. Within a day, the funds are moved from the cardholder's account to the retailer's account. In contrast, in an off-line debit purchase, the cardholder signs a slip authorizing the purchase (rather than entering a PIN), the card-issuing institution does not necessarily verify that there are sufficient funds or put a hold on those funds, and the funds take approximately one to seven days to be moved to the retailer's account. Plaintiffs contend that there is a higher incidence of fraud in off-line POS debit transactions because they are authorized by signature, rather than by PIN. Visa offers an off-line POS debit card called "Visa Check" and MasterCard offers one called "MasterMoney," both of which are the subject of this litigation.
 
 
 6
 Defendants have an "honor all cards" policy, which requires any merchant accepting any of their credit cards to accept all of their payment cards, including Visa Check and MasterMoney. According to plaintiffs, retailers are even prohibited by the defendants' "honor all cards" policy from asking customers whether they would mind using a different payment system. Defendants have set the interchange fees for Visa Check and MasterMoney at or near the same level as the interchange fees for their respective credit cards despite the fact that, according to plaintiffs, credit card transactions — which rely on the extension of credit — involve far more risk. The interchange fees for competing on-line debit cards — where the risk of non-payment is substantially eliminated — is far lower.
 
 
 7
 Plaintiffs contend that if Visa Check and MasterMoney were not tied to defendants' credit cards by the "honor all cards" rule, retailers would refuse to pay the high Visa Check and MasterMoney fees, and as a result, defendants would have to lower those fees. Plaintiffs also allege that defendants have undertaken measures to deceive retailers into accepting their off-line debit cards. Specifically, plaintiffs contend that defendants designed their off-line debit cards to be indistinguishable from their credit cards by making them visually and electronically identical and by setting identical interchange fees for their credit and off-line debit cards.
 
 
 8
 Thus, plaintiffs allege that defendants have created an illegal tie between Visa Check and MasterMoney and defendants' credit cards and have attempted and conspired to monopolize the debit card market in violation of sections 1 and 2 of the Sherman Act. Plaintiffs request both injunctive relief and money damages.
 
 
 9
 Plaintiffs moved to certify a class pursuant to Rule 23 consisting of "all persons and business entities who have accepted Visa and/or MasterCard credit cards and therefore are required to accept Visa Check and/or MasterMoney debit cards under the challenged tying arrangements, during the fullest period permitted by the applicable statutes of limitations." In support of their motion for class certification, plaintiffs submitted an expert report from Dennis Carlton, Ph.D in economics. ("Carlton"). Defendants opposed the motion for class certification and moved to strike Carlton's report. Defendants offered an expert report from Richard L. Schmalensee, Ph.D in economics ("Schmalensee"), in opposition to plaintiffs' motion for class certification and in support of their motion to strike. The district court issued a memorandum and order granting plaintiffs' motion for class certification and denying defendants' motion to strike Carlton's expert report. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68 (E.D.N.Y.2000). This Court granted defendants' petition to appeal, pursuant to Federal Rule of Civil Procedure 23(f),[3] the district court's grant of plaintiffs' motion for class certification.[4] On appeal, defendants argue that the district court abused its discretion by finding that: (1) plaintiffs' expert report was sufficient to support class certification; (2) common issues predominate over individual issues and that the case will be manageable as a class action, making certification under Rule 23(b)(3) appropriate; and (3) the class could also be certified under Rule 23(b)(2) even though plaintiffs request substantial monetary damages.
 
 DISCUSSION
 I. Standard of Review
 
 10
 This Court reviews a district court's grant or denial of a motion for class certification under a deferential standard. "Provided that the district court has applied the proper legal standards in deciding whether to certify a class, its decision may only be overturned if it constitutes an abuse of discretion." Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir.1999), cert. denied sub nom Metro-North Commuter R.R. Co. v. Norris, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000) (internal quotation marks omitted).
 
 II. Standards for Class Certification
 
 11
 To qualify for certification, plaintiffs must prove that the putative class action meets the four requirements set forth in Federal Rule of Civil Procedure 23(a):
 
 
 12
 (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 13
 Fed.R.Civ.P. 23(a); see also Caridad, 191 F.3d at 291. Additionally, a class action may be maintained only if it qualifies under at least one of the categories provided in Rule 23(b). Relevant to this action are Rules 23(b)(2) and (b)(3). Rule 23(b)(2) allows for the maintenance of a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Rule 23(b)(3) permits class certification "if the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Factors relevant to the superiority of a class action under Rule 23(b)(3) include:
 
 
 14
 (A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.
 
 
 15
 Id. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (internal quotation marks omitted).
 
 
 16
 III. Sufficiency of Plaintiffs' Expert Evidence
 
 
 A. The Expert Reports
 
 
 17
 The district court set forth in detail the contents of plaintiffs' and defendants' expert reports. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 74-76. The following is a brief summary of the contents of the expert reports.
 
 
 18
 Based on the allegations in the complaint, plaintiffs' expert, Carlton, theorized that absent the tying arrangement, a large number of retailers would have refused to accept Visa Check and MasterMoney and, as a result, defendants would have had to reduce their interchange fees in order to maintain merchant acceptance of those cards. Carlton concluded, therefore, that all class members have been injured by paying higher interchange fees for Visa Check and MasterMoney than they would have absent the tie. Based on this theory, Carlton stated that the following issues are subject to class-wide determination: (1) whether credit and debit cards have distinct characteristics; (2) whether Visa and MasterCard, individually and/or jointly, have market power in credit cards; and (3) whether Visa and MasterCard's tying policies injure all class members.[5] Carlton also proffered the following formula for calculating each class member's damages: In the absence of the tying arrangement, the interchange rates for Visa Check and MasterMoney would have been comparable to that of on-line debit cards, and therefore, an individual class member's damages could be calculated by measuring the overcharge it had paid on all of the Visa Check and MasterMoney transactions it accepted.
 
 
 19
 Defendants' expert, Schmalensee, maintained that Carlton's model of how the debit card market would operate absent the alleged tie did not adequately take into account the following consequences that would have accompanied the cessation of the tie: (1) there would be less usage of Visa Check and MasterMoney if their interchange fees decreased because banks would issue fewer cards and defendants would spend less money advertising the cards; (2) credit card interchange fees would increase as debit card interchange fees decreased if credit cards were no longer tied in a "package" to debit cards; and (3) the existence and extent of each individual merchant's injuries are not amenable to class-wide determination because damages depend on the merchant's mix of credit and debit transactions.
 
 
 20
 In response to Schmalensee's assertion that the usage of off-line debit cards would decrease absent the tie to credit cards, Carlton pointed to two real-world instances in which a reduction in interchange fees for a particular payment card led to an increase in its usage, rather than a decrease, as Schmalensee's model would predict: (1) usage of Visa's on-line POS debit card increased after Visa dramatically lowered its interchange fees in 1997; and (2) usage of Visa's off-line POS debit card significantly increased after Visa cut its interchange fees for that card in 1992. Carlton also presented the following empirical evidence contradicting Schmalensee's theory that credit and debit cards are tied in a "package" where the interchange fees for credit cards would increase as that of off-line POS debit cards decreased: (1) credit card interchange fees are not higher in Canada, despite the fact that Canadian banks do not issue off-line POS debit cards and thus do not have a "package" of debit and credit cards; and (2) in the United States between 1991 and 1998, interchange fees for off-line debit transactions greatly increased while credit card interchange fees generally stayed the same or increased slightly, as opposed to decreasing as Schmalensee's model would predict.
 
 B. Analysis
 
 21
 Defendants contend that the district court erroneously relied on Carlton's report in granting plaintiffs' class certification motion because, according to defendants, the district court improperly limited its scrutiny of the report and Carlton's expert opinion "failed to provide a credible basis for class certification." Although a trial court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 have been satisfied before certifying a class, "a motion for class certification is not an occasion for examination of the merits of the case." Caridad, 191 F.3d at 291 (internal quotation marks omitted). A district court must ensure that the basis of the expert opinion is not so flawed that it would be inadmissible as a matter of law. See Cruz v. Coach Stores, Inc., No. 96 Civ. 8099, 1998 WL 812045, at *4 n. 3 (S.D.N.Y. Nov.18, 1998) (disregarding expert report submitted in support of motion for class certification because the report was "fatally flawed"), aff'd in part, vacated in part on other grounds, 202 F.3d 560, 573 (2d Cir.2000) ("[Plaintiff] has not shown that the court abused its discretion in finding the report methodologically flawed."); accord In re Sumitomo Copper Litig., 182 F.R.D. 85, 91 (S.D.N.Y.1998) (granting class certification upon finding that "plaintiffs' econometric methodologies have a reasonable probability of establishing" plaintiffs' claims by common proof); In re Disposable Contact Lens Antitrust Litig., 170 F.R.D. 524, 531-32 (S.D.Fla. 1996) (granting class certification upon finding that "Plaintiffs have demonstrated at least a `colorable method' of proving [common injury] at trial"); In re Potash Antitrust Litig., 159 F.R.D. 682, 687 (D.Minn.1995) (stating that "in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all"). However, a district court may not weigh conflicting expert evidence or engage in "statistical dueling" of experts. Caridad, 191 F.3d at 292-93. The question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive. Id. at 292-93.
 
 
 22
 To the extent that defendants' contention is that the court did not sufficiently examine whether Carlton's methodology was fatally flawed, and thus inadmissible even for class certification purposes, we reject this argument as meritless. The district court, in an almost fifty page opinion, thoroughly considered each of defendants' criticisms of Carlton's theory and Carlton's response to each of those criticisms and concluded in each case that Carlton's response sufficiently addressed the criticism. The district court correctly noted that its function at the class certification stage was not to determine whether plaintiffs had stated a cause of action or whether they would prevail on the merits, but rather whether they had shown, based on methodology that was not fatally flawed, that the requirements of Rule 23 were met. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 76, 79. As for defendants' claim that plaintiffs' expert evidence failed to provide a reliable basis for class certification, the district court's finding that Carlton's methodology was not fatally flawed, and therefore, was sufficiently reliable for class certification purposes, does not constitute an abuse of its discretion. Cf. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 455-56 (3d Cir.1977) (vacating and remanding the district court's denial of plaintiffs' motion for class certification where plaintiffs could use an overcharge theory to prove their antitrust tying claims).
 
 IV. Rule 23(b)(3) Certification
 
 23
 After finding that plaintiffs had shown that they met the requirements of Rule 23(a), the district court determined that the putative class is maintainable under Rule 23(b)(3) because plaintiffs had "establish[ed] that the common questions of law and fact identified predominate over any individual questions and that a class action is superior to any other means of adjudication" because "[w]ithout class certification, there are likely to be numerous motions to intervene, and millions of small merchants will lose any practical means of obtaining damages for defendants' allegedly illegal conduct." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 88. Defendants argue that the district court erred by certifying the class pursuant to Rule 23(b)(3) because individual questions predominate over the common issues and because the case will be unmanageable as a class action.[6]
 
 A. Predominance
 
 24
 "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir.2000) (internal quotation marks omitted).
 
 1. Violation of Antitrust Law
 
 25
 The district court examined whether plaintiffs could establish each of the three required elements of an antitrust claim — (1) a violation of antitrust law; (2) injury and causation; and (3) damages — using common evidence. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 81-88. Concerning proof of the substantive elements of an antitrust violation, the district court determined that plaintiffs could use common proof to establish the existence of a tying arrangement and to show defendants' market power. Id. at 87. Additionally, the court found that the question of coercion was also amenable to proof on a class-wide basis because the contractual provision to which all class members were subject — the "honor all cards" rule — would establish the requisite coercion. Id. at 88. Defendants do not seriously dispute on appeal that common proof could be used to prove the substantive elements of the antitrust violations, and the district court's findings on this issue do not constitute an abuse of its discretion.
 
 2. Injury-in-fact
 
 26
 The district court also determined that plaintiffs' overcharge theory would permit them to establish injury-in-fact on a class-wide basis. Id. at 81-87. The court noted that although defendants argued that the overcharge theory was too speculative, defendants conceded in their briefs that the theory "is not unknown" and they did not "contend that no plaintiff could ever recover" under such a theory. Id. at 83. Defendants also claimed that injury-in-fact could not be established using common proof because the district court would be required to examine a number of issues on an individual basis, including whether a merchant would have continued to accept off-line debit cards at their current prices even absent the tie, whether the merchant had the ability to process on-line debit transactions, and what forms of payment would replace the transactions formerly processed as off-line debit transactions. Id. at 82. The district court rejected this argument, finding that "Carlton's scenario is a complete answer to the defendants' attack on the theory of the complaint; it posits class-wide injury resulting from every single class member's overpaying for off-line debit cards as a direct result of the tie" and that "Carlton's theory does not require analysis of any of the individualized questions" suggested by defendants. Id. at 82-83.
 
 
 27
 The district court further found that plaintiffs had responded persuasively to defendants' other argument regarding injury-in-fact-that credit card interchange fees would increase if off-line debit card interchange fees decreased without the tie. Id. at 84. The court explained that plaintiffs had presented empirical evidence showing that credit card interchange fees do not necessarily increase when debit card interchange fees decrease; had informed the court that as part of their attempt-to-monopolize claim, they would demonstrate that the defendants had attempted to monopolize the debit card market in part to keep credit card interchange fees high; and had impeached Schmalensee on this issue by pointing to his deposition testimony that, although he thought it was likely credit card interchange fees would increase absent the tie, he had not "pushed it far enough to have an opinion." Id. at 84. Thus, the district court concluded that plaintiffs had met their burden of showing that injury-in-fact was amenable to common proof and that class treatment was therefore appropriate. Id.
 
 3. Causation
 
 28
 The district court also considered and rejected defendants' arguments that causation could not be proven on a class-wide basis. The court found that defendants' contention that, absent the tie, they would have selectively reduced fees as necessary to retain individual merchants' business was too speculative because defendants had not previously engaged in such merchant-specific pricing. Id. at 85. The court also observed that although defendants do have broad pricing categories for different classes of merchants, Carlton's damage formula could "easily be adjusted to account for that fact." Id. Further, the court found that defendants' claim that the usage of Visa Check and MasterMoney would decrease absent the tie was contradicted by empirical evidence and was not relevant to Carlton's overcharge theory. Id.
 
 
 29
 The court further found that defendants' contention that a merchant's ability to "steer" makes it impossible for plaintiffs to prove causation on a class-wide basis was without merit. Defendants argued that if a merchant did not want to accept off-line debit cards because of the allegedly inflated fees it would have to pay, the merchant could "steer" its customers to other forms of payment by, for example, converting the transaction to on-line debit by asking for a PIN or for another form of payment. Id. at 85-86. The court found, however, that if a customer refused to be steered, the merchant would have to allow the customer to complete the off-line debit transaction under defendants' "honor all cards" rule. The court stated that "[t]he presence of injury and causation is binary; it is either there or it is not. According to Carlton's theory, injury and causation is present for every putative class member." Id. at 86. The court observed, however, that if defendants "repackaged" their steering argument "as one addressing mitigation of damages," rather than causation, it "may ... have force." Id. Therefore, the court concluded that causation also could be proven on a class-wide basis.
 
 
 30
 Defendants' arguments on appeal regarding the district court's finding that the existence of injury and causation can be established by class-wide proof appear merely to rehash their many criticisms of Carlton's theory. Because we find that the district court's resolution of these issues did not constitute an abuse of its discretion, see supra Section III.B., we affirm the district court's determination that the existence of injury and causation can be proven on a class-wide basis.
 
 4. Damages
 
 31
 The heart of defendants' predominance argument is that the common issues in this action do not predominate over the individual damages questions, primarily the defense of mitigation of damages by steering.[7] Although a court must examine the relevant facts and both the claims and defenses in determining whether a putative class meets the requirements of Rule 23(b)(3), the fact that a defense "may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones." See Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir.2000). Rather, "[a]s long as a sufficient constellation of common issues binds class members together, variations in the sources and application of [a defense] will not automatically foreclose class certification under Rule 23(b)(3)." Id.; accord Williams v. Sinclair, 529 F.2d 1383, 1388 (9th Cir.1975) (stating that the existence of a defense "does not compel a finding that individual issues predominate over common ones" when there is a "sufficient nucleus of common questions"). Therefore, the question for purposes of determining predominance is not whether a defense exists, but whether the common issues will predominate over the individual questions raised by that defense.
 
 
 32
 Defendants' mitigation defense goes only to the calculation of damages. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 86. The district court found that Carlton's common formula for damages — that absent the tie, the interchange fees for off-line debit cards would have decreased, the interchange fees for credit cards would not have increased, and that an individual merchant's damages could be calculated by comparing those fees with the interchange fees actually paid — was not fatally flawed. Id. at 74, 84-85. We have already stated that the district court's determination did not constitute an abuse of its discretion. See supra Section III.B.; cf. Bogosian, 561 F.2d at 455 (stating that in proving injury and damages for an illegal tie, "plaintiff[s] may recover the amount of the illegal overcharge" and "could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that [each plaintiff] made some purchases at the higher price"). Assuming arguendo that the mitigation defense is in-fact viable,[8] the majority of the issues relating to this defense are common to the class, including, inter alia, whether defendants' "honor all cards" rule allows steering and whether steering is impeded due to the physical similarities between Visa Check and MasterMoney and defendants' credit cards. The only individualized question regarding this mitigation defense, if viable, is the extent to which a particular merchant could have steered.
 
 
 33
 Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues. See, e.g., Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 298 (5th Cir.2001) (affirming district court's determination that common issues predominated because "[a]lthough calculating damages will require some individualized determinations, it appears that virtually every issue prior to damages is a common issue"); Bogosian, 561 F.2d at 456 (stating that although calculation of damages in an antitrust action would involve some individualized issues, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"); Gold Strike Stamp Co. v. Christensen, 436 F.2d 791, 796, 798 (10th Cir.1970) (affirming district court's determination that common issues predominated in an antitrust suit "where the question of basic liability can be established readily by common issues" and stating that "[t]he fact that there may have to be individual examinations on the issue of damages has never been held, however, a bar to class actions"); Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); 8 Julian O. von Kalinowski et al., Antitrust Laws and Trade Regulations § 166.03[3][a][i] (2d ed. 1997) ("In antitrust cases, courts are more likely to consider the critical issue to be whether common liability issues predominate and to disregard individual damages ... questions."); 4 Herbert Newberg & Alba Conte, Newberg on Class Actions § 18.27, at 18-89 (3d ed.1992) (stating that for antitrust class actions, "[a] particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class"); cf. II Phillip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 331d, at 282 (2d ed. 2000) ("Although the evidence establishing damages usually varies from class member to class member, this fact alone does not defeat certification."); see generally Fed.R.Civ.P. 23(b)(3) advisory committee's notes to 1966 Amendments (explaining that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action [under Rule 23(b)(3)], and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class"). District courts have correctly recognized that any other rule would eliminate antitrust class actions:
 
 
 34
 [I]f defendants' argument (that the requirement of individualized proof on the question of damages is in itself sufficient to preclude class treatment) were uncritically accepted, there would be little if any place for the class action device in the adjudication of antitrust claims. Such a result should not be and has not been readily embraced by the various courts confronted with the same argument. The predominance requirement calls only for predominance, not exclusivity, of common questions.
 
 
 35
 In re Alcoholic Beverages Litig., 95 F.R.D. 321, 327-28 (E.D.N.Y.1982) (internal quotation marks omitted); see also In re Catfish Antitrust Litig., 826 F.Supp. 1019, 1044 (N.D.Miss.1993) (same); In re Fine Paper Antitrust Litig., 82 F.R.D. 143, 154 (E.D.Pa.1979), aff'd, 685 F.2d 810 (3d Cir. 1982) (same).
 
 
 36
 Under Carlton's theory of the case, which the district court found to be sufficiently reliable for class certification purposes, plaintiffs can prove on a class-wide basis: (1) the substantive elements of the antitrust violations; (2) injury-in-fact and causation; (3) viability of the mitigation defense; and (4) general application of the overcharge formula for damages. In contrast, the only issues that might require some individualized inquiry under Carlton's theory are: (1) the extent to which a particular merchant could have steered customers away from off-line debit card transactions, assuming the mitigation defense is viable; and (2) the calculation of damages using the overcharge formula and, if necessary, mitigation. Under these circumstances, we cannot say that the district court's conclusion that the common issues of law and fact predominated over the individualized issues constitutes an abuse of its discretion.
 
 B. Manageability
 
 37
 Defendants also argue that the calculation of individualized damages makes this case unmanageable as a class action. We disagree. There are some situations where courts have determined that a case is not manageable as a class action because of the necessity for individualized damages determinations. See, e.g., II Areeda et al., supra, ¶ 331, at 283 n. 22; 8 von Kalinowski et al., supra, § 166.03[3] (collecting cases). Nevertheless, failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and "`should be the exception rather than the rule.'" In re S. Cent. States Bakery Prods. Antitrust Litig., 86 F.R.D. 407, 423 (M.D.La.1980) (quoting Manual for Complex Litigation, § 1.43 n. 72 (1977)); see also In re Workers' Compensation, 130 F.R.D. 99, 110 (D.Minn.1990) (stating that "dismissal for management reasons is never favored"); In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 78 F.R.D. 622, 628 (W.D.Wa.1978) (stating that "dismissal for management reasons, in view of the public interest involved in class actions, should be the exception rather than the rule") (internal quotation marks omitted); 8 von Kalinowski et al., supra, § 166.03[3][b][iv] ("Generally, though, class action status will be denied on the ground of unmanageability only when it is found that efficient management is nearly impossible; some courts have stated that there is a presumption against refusing to certify a class on manageability grounds.") (emphasis in original); see generally Yaffe v. Powers, 454 F.2d 1362, 1365 (1st Cir.1972) (stating that "for a court to refuse to certify a class... because of vaguely-perceived management problems ... discount[s] too much the power of the court to deal with a class suit flexibly, in response to difficulties as they arise").
 
 
 38
 There are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries;[9] (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class. See, e.g., Fed. R.Civ.P. 23(c)(4) (stating that "[w]hen appropriate, (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class"); In re Master Key Antitrust Litig., 528 F.2d 5, 12 n. 11, 14 (2d Cir.1975) (discussing use of a separate liability and damages trial in an antitrust case and, if appropriate, use of subclasses to facilitate damages determination); Green v. Wolf Corp., 406 F.2d 291, 300-01 (2d Cir.1968) (stating that "[t]he district court may use the procedures suggested by Rule 23 to cope with the [distinctions between plaintiffs], if, indeed, they exist" and noting that if the district court encounters individual damages issues "[t]he effective administration of 23(b)(3) [may]... require the use of the sensible device of split trials") (internal quotation marks omitted); 1 Newberg & Conte, supra, § 4.26, at 4-91 to 4-97 (collecting cases applying each of these management tools); 4 Newberg & Conte, supra, § 18.27, at 18-98 (stating that courts "usually provide for a separate proceeding" in antitrust suits where individualized damages issues arise); 8 von Kalinowski et al., supra, § 166.03[3][a][i] (discussing adjudication of individualized questions in separate actions or in separate damage proceedings, allowing a class action to proceed for the purposes of litigating particular issues, or dividing the class into subclasses, and collecting cases applying those tools); id. at § 166.03[3][b][iv] (stating that manageability problems may be obviated by dividing the class into subclasses or confining certification to certain issues). We emphasize that "the issue of manageability of a proposed class action is always a matter of justifiable and serious concern for the trial court and peculiarly within its discretion." Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir.1977) (internal quotation marks omitted).
 
 
 39
 The district court recognized that although it appeared at this preliminary stage that damages could be determined with the aid of a class-wide formula, it had the flexibility to address any individualized damages issues, including the steering mitigation defense, that might arise. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 86 n. 19, 89. In this regard, the court specifically recognized its ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately became necessary. Id. at 89. Because the district court adequately considered how it would address any individualized issues that might arise in the case, the district court's conclusion that this action will be manageable as a class action does not constitute an abuse of its discretion.
 
 
 40
 Defendants erroneously suggest that our decision in Abrams v. Interco, Inc., 719 F.2d 23 (2d Cir.1983), compels a finding that this case is unmanageable. In Abrams, we held that the district court did not abuse its discretion by declining to certify an antitrust suit on manageability grounds. The district court in Abrams determined that individualized issues of fact would "greatly predominate" over common issues, causing "severe difficulties in the management of the class action" because "[b]y alleging a conspiracy with some dealers, coercion of others, and bribery of still others, the plaintiffs had raised issues relating to [defendant's] individual relationships with each of its thousands of dealers." Abrams, 719 F.2d at 29 (internal quotation marks and alterations omitted). The district court observed that certification might have been appropriate if plaintiffs had instead alleged "some pattern on [defendant's] part which was reasonably consistent, affecting all or most of the dealers referred to in the complaint." Id. (internal quotation marks omitted). We affirmed the district court's finding that the case was unmanageable, particularly with regard to damages, because plaintiffs' damages calculations "would be complicated by the scores of different products involved, varying local market conditions, fluctuations over time, and the difficulties of proving consumer purchases after a lapse of five or ten years" and would necessitate "individual trials on damages" for "thousands or millions" of class members. Id. at 31 (internal quotation marks omitted).
 
 
 41
 In stark contrast, the action before us involves only two products (credit cards and off-line POS debit cards) with set interchange fees and class members who can be identified by defendants' own records. In this action, unlike in Abrams, there are no individualized issues relating to each plaintiffs' relationship with Visa and MasterCard because defendants' "honor all cards" rule contractually applied to each of the plaintiffs in the putative class. Additionally, plaintiffs here, unlike in Abrams, have alleged a common practice affecting each member of the class and have proffered a damages formula to assist with the calculation of damages. Thus, we find defendants' reliance on Abrams is misplaced.
 
 
 42
 We conclude that the district court did not abuse its discretion in finding that the action will be manageable as a class action.
 
 C. Adequacy of Representation
 
 43
 The dissent discusses an issue not raised by the parties regarding adequacy of representation. Rule 23(a)(4) provides that, in order to certify a class, its proponents must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). This rule requires courts to ask whether "plaintiff's interests are antagonistic to the interest of other members of the class." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir.2000); see also Amchem, 521 U.S. at 625-26, 117 S.Ct. 2231 (stating that class members must "possess the same interest and suffer the same injury" to meet the Rule 23(a)(4) requirement) (internal quotation marks omitted). The dissent argues that the district court abused its discretion by failing to determine which of the two available techniques for measuring damages should be used before it decided to certify the class, because the choice of the "correct" measure of damages in this action would lead to conflicts among class members and inadequacy of representation. We disagree.
 
 
 44
 As the dissent points out, and the district court recognized, there are two basic methods that courts use to measure damages in tying cases. One method is the "tied product" approach, as referred to by the district court. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 85 n. 15. Under this measure, the damages awarded reflect the difference between the price actually paid for the tied product and the price for which the item could have been purchased on the open market. See 8 von Kalinowski et al., supra, § 171.03[1], at 171-28 (describing the tied product approach). The second approach is the so-called "package" measure, which would award damages only to the extent that the plaintiff overpaid for the combination of the tied and tying products. See X Phillip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1769c, at 430-31 (1996) (asserting the package approach as the proper standard).
 
 
 45
 The question of whether to apply the "tied product" or "package" approach is a complex issue that has long divided the circuits. Compare Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1054 (5th Cir.1982) (tied product approach), and Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir.1981) (tied product approach), and Northern v. McGraw Edison Co., 542 F.2d 1336, 1347 (8th Cir.1976) (tied product approach), with Will v. Comprehensive Accounting Corp., 776 F.2d 665, 673 (7th Cir.1985) (package approach), and Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.1982) (package approach), and Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52-53 (9th Cir.1971) (package approach). This Court has not taken a position on the issue.
 
 
 46
 The district court discussed these competing lines of cases when it considered whether the alleged injury-in-fact was amenable to class-wide treatment. See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 83-84. Defendants advocated the "package" measure and contended that, under this approach, injury-in-fact would no longer be susceptible to class-wide proof. Id. Plaintiffs countered that, under the "tied product" approach, the process of proving damages would be uniform among the class members. Id. The district court did not choose between the two approaches because it found that plaintiffs' theory of the case, supported by their expert, rendered such a decision unnecessary. Id. The plaintiffs' expert opinion asserted, as discussed above, that the price of the tying product (the credit cards) would not have risen absent the tie. Id. The district court found this evidence credible and determined that plaintiffs had made a showing, sufficient to support class certification, that the price of the tied package would decline without the tie. Id. As a result, the court concluded that it "need not choose between the competing line of cases [because] plaintiffs have proffered a sufficient theory of class-wide injury under either the `package' or the `tied product' measure of injury." Id. at 85 n. 15.
 
 
 47
 The dissent contends that choosing a damage measure was essential to the disposition of this case and that failure to do so was an abuse of discretion. In the dissent's view, the correct measure of damages is the "package" approach. See post, at 155. The dissent argues that if the district court had properly decided this issue and had correctly chosen the "package" approach, certification would have been defeated because the interests of the class members would have conflicted, causing inadequacy of representation. Id. Because this is a variable proportion tying case, according to the dissent, class members who have transacted predominantly with credit cards would have interests differing from those who have processed mostly debit cards.
 
 
 48
 There is no need on this interlocutory appeal from class certification for this Court to decide which of the two approaches to measuring damages in tying cases is appropriate. By engaging in the following analysis, this Court does not endorse the "package" measure of damages. We consider the question to be an open one in this Circuit. We proceed on the assumption that the "package" measure would apply only to test the dissent's contention that, if this approach were adopted, intractable conflicts would emerge within the class. This contention forms the basis of the dissent's conclusion that the district court abused its discretion by not choosing a measure of damage before deciding to certify the class. Because we conclude that the possible tensions identified by the dissent are not fatal to certification, we find that the district court did not abuse its discretion by declining to decide the issue at the certification stage.
 
 
 49
 As an initial matter, we note that the dissent's concerns turn largely on the sufficiency of the plaintiffs' expert opinion. We have already affirmed the district court's finding regarding the sufficiency of that opinion, concluding that it was not fatally flawed. This expert opinion, adequate to support our finding of predominance under Rule 23(b)(3), is likewise sufficient to uphold a finding of adequacy of representation under Rule 23(a)(4).
 
 
 50
 The dissent maintains, however, that the very choice to adopt this expert theory is symptomatic of intractable conflicts within the class, causing certification to run afoul of Rule 23(a)(4). See post, at 158. The dissent divides the class into three groups of merchants, based on the merchants' proportion of debit card sales to credit card sales. The interests of these three groups, according to the dissent, would be fundamentally at odds if the "package" measure of damages were applied at trial.[10] Including these three groups in one class, the dissent argues, compromises the interests of the merchants whose debit card sales predominate over their credit card sales. For these merchants, the task of proving that credit card prices would not be higher without the tie "is unnecessary and impedes recovery under other theories that offer better prospects of recovery." Id.
 
 
 51
 The dissent overstates the potential conflict. The three types of merchants discussed by the dissent have much in common-not only as to liability, but as to damages as well. All class members, regardless of their debt/credit proportion, wish to prove that the debit card fees would be significantly lower without the tie. Every member also has an interest in establishing the hypothetical, "untied" price as low as possible in order to maximize recovery of damages. As for establishing the hypothetical, "untied" price of credit cards, the tension is not nearly as pronounced as the dissent contends. It may be less vital for merchants with predominantly debit card sales to prove that credit cards would be no more expensive without the tie. It is, however, still in the interest of these merchants to show that credit card fees would not have increased, because any finding to the contrary would likely reduce, though not decimate, their damage awards if the "package" measure were applied. It would seem to maximize the potential recovery for all three groups to argue, as they do here, that credit card prices would not increase without the tie. Other theories may or may not be simpler to prove. Even if they are, the debit-heavy merchants would not necessarily choose to concede that credit card prices would increase, and see their potential damage awards diminished.
 
 
 52
 Even if a level of conflict may exist among the three groups, that potential for conflict need not defeat certification. While Rule 23(a)(4) is designed to ferret out potential conflicts between representatives and other class members, see Amchem, 521 U.S. at 625-26, 117 S.Ct. 2231, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." 1 Newberg & Conte, supra, § 3.26, at 3-143. "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental," id. § 3.26, at 3-143 to -144, and "speculative conflict should be disregarded at the class certification stage." Id. § 3.25, at 3-136; see also 5 James Wm. Moore et al., Moore's Federal Practice § 23.25[4][b][ii], at 23-119 (3d ed.1998) (stating that to find inadequacy of representation "most courts hold that the conflict must be more than merely speculative or hypothetical"). Courts have applied these general principles with regularity in the area of antitrust. See 4 Newberg & Conte, supra, § 18.14, at 18-40 to 43 n. 65 (collecting antitrust class action cases in which differences among class members were not held to result in inadequacy of representation); cf. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir.1968), vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (explaining that, in antitrust litigation, the fact that class members may "have varying theories as to what constitutes the `excessive price'" will not generally defeat certification where all members "will be helped if the rates are found to be excessive").
 
 
 53
 In the event that the district court does find conflicts arising of the type identified by the dissent, there are a variety of devices available to resolve the problem. We discussed a battery of options in Part IV.B. of this opinion. Of particular relevance here are the possibilities of bifurcating liability and damage trials, decertifying the class after the liability trial, and creating subclasses. The availability of this range of options sufficiently addresses the dissent's concerns regarding adequacy of representation.
 
 
 54
 Having determined that the district court did not abuse its discretion in finding that common issues of law and fact predominate, that the action will be manageable as a class action, and that choosing a measure of damages was not required before certification, we affirm the district court's certification of the class under Rule 23(b)(3).
 
 D. Effect of Certification
 
 55
 Given these conclusions regarding the soundness of the class under Rule 23, the dissent's comments about the possibility that certification will coerce defendants into settlement are largely inapposite. The effect of certification on parties' leverage in settlement negotiations is a fact of life for class action litigants. While the sheer size of the class in this case may enhance this effect, this alone cannot defeat an otherwise proper certification. The dissent notes that, in our recent decision in Sumitomo, we listed as a basis for granting a Rule 23(f) appeal the fact that "the certification order will effectively terminate the litigation." 262 F.3d at 139-40; post, at 147. We need not decide whether this is such a "death knell" certification because the other basis for granting a Rule 23(f) appeal — the existence of legal questions requiring resolution — is present. See ante, at 131-132 n. 3. Even assuming arguendo that we found this to be a "death knell" case, under Sumitomo that finding would bear only on our decision to grant the interlocutory appeal. Now that we have granted the appeal and found the district court's certification decision to be thorough, accurate, and not an abuse of discretion, the dissent's argument about coercion loses its force.
 
 
 56
 Meanwhile, the dissent underestimates the powerful policy considerations that favor certification, and ignores the exhaustive analysis performed by the district court, carefully applying the Rule 23 requirements for class certification. While both the district court and this Court have acknowledged that difficulties in managing this large class action may arise, these problems pale in comparison to the burden on the courts that would result from trying the cases individually. See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 88 (observing that "[w]ithout class certification, there are likely to be numerous motions to intervene, and millions of small merchants will lose any practical means of obtaining damages for defendants' allegedly illegal conduct").
 
 
 57
 It is not as though the class members were haphazardly thrown together, nor "herded" or "agglomerated" as the dissent contends. Post, at 157, 153. They were, after all, allegedly aggrieved by a single policy of the defendants. Given the strong commonality of the violation and the harm among the merchants, this is precisely the type of situation for which the class action device is suited.
 
 V. Rule 23(b)(2) Certification
 
 58
 Certification under Rule 23(b)(2) is permissible when defendants have acted on grounds generally applicable to the class, making final injunctive or declaratory relief appropriate. Fed.R.Civ.P. 23(b)(2). Certification under Rule 23(b)(2) is not appropriate, however, in "cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed.R.Civ.P. 23(b)(2) advisory committee's notes to 1966 Amendments.
 
 
 59
 The district court found that the putative class is certifiable under Rule 23(b)(2), in addition to Rule 23(b)(3), because "[t]he `honor all cards' rule is `generally applicable' to all members of the class, and the request for an injunction ending it is central to the plaintiffs' suit."[11] In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 88. The court estimated that the injunctive relief requested would have an economic value of $63 billion, which is significant even when compared to the preliminary monetary damage estimate of $8 billion. Id. at 88-89. Defendants contend that the district court abused its discretion by finding that this action is maintainable under Rule 23(b)(2). Specifically, relying on a recent line of cases from other circuits, defendants argue that the money damages in this case predominate because they are not merely incidental to the injunctive relief, making class certification under Rule 23(b)(2) inappropriate. See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir.1998) (reh'g denied by 1998 U.S.App. LEXIS 24651) ("[M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or declaratory relief."); see also Murray v. Auslander, 244 F.3d 807, 812 (11th Cir.2001) (adopting reasoning of Allison Court); Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 898 (7th Cir.1999) (same).
 
 
 60
 Neither the Supreme Court nor this Circuit has delineated the precise circumstances under which a putative class requesting both injunctive and monetary relief can be certified under Rule 23(b)(2). See Jefferson, 195 F.3d at 897 ("It is an open question ... in the Supreme Court whether Rule 23(b)(2) ever may be used to certify a no-notice, no-opt-out class when compensatory or punitive damages are in issue.") (citing Ticor Title Insurance Co. v. Brown, 511 U.S. 117, 121, 114 S.Ct. 1359, 128 L.Ed.2d 33, (1994)) (emphasis in original); cf. 1 Newberg & Conte, supra, § 4.14, at 4-49 ("Least settled is the common situation when both injunctive relief and damages are sought for the class, and both forms of relief are important and equally sought. Most courts use a predominance test to determine which form of relief is primary, and in light thereof, whether Rule 23(b)(2) or (b)(3) applies."). We need not delve into this thorny question today, however, because we have already concluded that the district court appropriately certified the class under Rule 23(b)(3). See 8 von Kalinowski et al., supra, § 166.03 ("Once a court has found that a class action is maintainable under any single category [of Rule 23(b)], there is no necessity of showing that it may also be brought under any other."); see also Jefferson, 195 F.3d at 898 ("Rule 23(b) begins by saying that an action `may' be maintained as a class action when the prerequisites of subdivision (a) and a part of subdivision (b) have been satisfied; it does not say that the class must be certified under the first matching section.") (emphasis in original).
 
 
 61
 In any event, the primary concern about certifying a class with significant damages under Rule 23(b)(2) is the absence of mandatory notice and opt-out rights. See Lemon v. Int'l Union of Operating Eng'rs, 216 F.3d 577, 580-82 (7th Cir.2000); Allison, 151 F.3d at 414-15. Because these rights are guaranteed under Rule 23(b)(3), pursuant to which this action will now proceed, our inquiry need progress no further. See Lemon, 216 F.3d at 581-82 (discussing methods for avoiding procedural problems in cases with both injunctive and monetary relief); cf. Chateau De Ville Prods., Inc. v. Tams Witmark Music Library, Inc., 586 F.2d 962, 966 n. 14 (2d Cir.1978) (noting that when a district court certifies a class under both Rule 23(b)(2) and (b)(3), "major problems can arise ... where different procedural consequences attach depending upon the subsection used"). Therefore, we need not consider whether the district court erred by certifying the class under Rule 23(b)(2) in addition to Rule 23(b)(3).
 
 CONCLUSION
 
 62
 For these reasons, we affirm the district court's grant of plaintiffs' motion for class certification pursuant to Rule 23(b)(3).
 
 
 
 Notes:
 
 
 *
 The Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 When a bank acts as both a card-issuing and an acquiring institution, it retains the entire discount fee
 
 
 [2]
 As the district court noted, the complaint includes the following illustration of the chain of transactions:
 Bank A issues a Visa credit card to Consumer X, who purchases a garment for $100 at Store Y, which was "acquired" for Visa by Bank B. Visa rules mandate that Bank B must pay Bank A an interchange fee of 1.25% of the amount of the transaction, i.e., $1.25. Bank B will charge Store Y a "discount fee" higher than $1.25 in order to recover the mandated interchange fee and other fees that Visa rules mandate Bank B to pay Visa on each and every Visa credit card (and debit card) transaction and to earn a profit for itself. Thus, Bank B may charge a discount fee of 1.60% of the transaction amount (or $1.60) to Store Y. When Store Y presents Consumer X's $100 Visa transaction to Bank B, the bank will credit Store Y's account for $98.40, send the Visa mandated $1.25 interchange fee to Bank A and retain the $.35 balance of the "discount fee."
 In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68, 72 n. 3 (E.D.N.Y.2000).
 
 
 [3]
 Rule 23(f) provides "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order." Fed.R.Civ.P. 23(f). After the defendants' petition to appeal was granted, the appeal briefed and argued, but before we rendered this decision, this Court established a standard for determining whether to grant a Rule 23(f) petition: Petitioners must demonstrate either "(1) that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable, or (2) that the certification order implicates a legal question about which there is a compelling need for immediate resolution."In re Sumitomo Copper Litig., 262 F.3d 134, 139-40 (2d Cir.2001). In this case, interlocutory jurisdiction was appropriate to resolve the uncertainty regarding the proper standard for evaluating expert opinions at the class certification stage, and to address the questions of predominance and manageability in light of individualized damage issues that emerge in tying cases.
 
 
 [4]
 Defendants petitioned this Court under Rule 23(f) to review the district court's grant of plaintiffs' motion for class certification. This Court granted defendants permission to appeal the district court's grant of plaintiffs' motion for class certification, not the district court's denial of defendants' motion to strike. Under these circumstances, we have no jurisdiction to review the motion to strike. We note that a motion to strike expert evidence pursuant toDaubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), involves a inquiry distinct from that for evaluating expert evidence in support of a motion for class certification, see infra Section III. A., although the parties' substantive arguments in both instances may be similar, as is true in this case. A Daubert motion is typically not made until later stages in litigation, such as in association with a motion for summary judgment, motion in limine, or at trial, and a district court should not postpone consideration of a motion for class certification for the sake of waiting until a Daubert examination is appropriate. See Fed.R.Civ.P. 23(c)(1) ("As soon as practicable after commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained.").
 
 
 [5]
 The substantive elements of plaintiffs' illegal per se tying claim are: (1) that the tying arrangement affects a substantial amount of interstate commerce; (2) the two products are distinct; (3) the defendant actually tied the sale of the two products; and (4) the seller has appreciable market power in the tying marketSee United States v. IBM Corp., 163 F.3d 737, 741 (2d Cir.1998). Plaintiffs could also prove their tying claims under a rule of reason theory, requiring plaintiffs to prove that the challenged action had an adverse effect on competition as a whole in the relevant market and, if the defendant shows a pro-competitive redeeming virtue of the action, that the same pro-competitive effect could be achieved though an alternative means that is less restrictive of competition. See Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 56 (2d Cir.1997). The substantive elements of a monopoly claim are that: (1) defendants have engaged in predatory or anticompetitive conduct; (2) with the specific intent to monopolize; and (3) with a dangerous probability of achieving monopoly power. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). For any antitrust violation, "a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).
 
 
 [6]
 We do not separately discuss the requirements of Rule 23(a). On appeal, defendants' arguments primarily focus on whether the class is maintainable under either Rule 23(b)(2) or (b)(3). To the extent that defendants contend that plaintiffs failed to establish commonality and typicality as required by Rule 23(a) because individualized questions will arise regarding each plaintiff, we, like the district court, address these arguments in the context of the predominance requirement of Rule 23(b)(3)In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 81-88.
 
 
 [7]
 Plaintiffs contend that defendants waived this argument by raising below the issue of steering only in the context of plaintiffs' ability to prove injury-in-fact on a common basis and not as a mitigation defense that would preclude a finding of predominance and make the class unmanageableSee Kraebel v. New York City Dep't of Hous. Pres. and Dev., 959 F.2d 395, 401 (2d Cir.1992) ("We have repeatedly held that if an argument has not been raised before the district court, we will not consider it...."). The district court correctly interpreted defendants' briefs as arguing that steering negated plaintiffs' ability to prove causation, not damages, by class-wide proof, although the court did observe that the steering argument could possibly be "repackaged as one addressing mitigation of damages." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 85-86. However, because defendants' contention that they raised below the steering argument in relation to damages finds support in their expert's affidavits, we address this argument on appeal.
 
 
 [8]
 Plaintiffs dispute defendants' claim that the "honor all cards" rule permits individual merchants to steer customers to other forms of payment. Plaintiffs' motion for summary judgment to dismiss this mitigation defense is pending before the district court
 
 
 [9]
 A district court's ability to bifurcate a trial is limited by the Seventh AmendmentSee Blyden v. Mancusi, 186 F.3d 252, 268 (2d Cir. 1999) ("At bottom, issues may be divided and tried separately, but a given issue may not be tried by different, successive juries."). Despite defendants' briefing on this issue, it would be premature for us to determine whether and under what circumstances bifurcation might be permissible in this case.
 
 
 [10]
 The dissent concedes that, under the "tied product" approach, "the interests of the class members would be aligned."Post, at 155.
 
 
 [11]
 The court noted that because it found certification appropriate under both Rule 23(b)(2) and (3), its inclination was to provide general notice to the class but to provide opt-out only as to the damages claims. It stated, however, that it would solicit the parties' views on the questionId. at 89.
 
 
 JACOBS, Circuit Judge, dissenting:
 
 63
 I respectfully dissent.
 
 
 64
 In In re Sumitomo Copper Litigation, we recently held that "petitioners seeking leave to appeal pursuant to Rule 23(f) must demonstrate either (1) that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decisions is questionable, or (2) that the certification order implicates a legal question about which there is a compelling need for immediate resolution." 262 F.3d at 139, (2d Cir.2001) This approach accords with the advisory committee's note to the Rule: "Permission to appeal ... is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation." Fed.R.Civ.P. 23 advisory committee's note.
 
 
 65
 Appellants here have made a more than sufficient showing under Sumitomo (A) that the certification order tends to terminate the litigation by a coercive settlement and (B) that two crucial rulings (embedded in the district court's otherwise thorough opinion) are questionable, to say the least.
 
 
 66
 (A) Rule 23(f) was adopted in part to alleviate the danger that an erroneous "order granting certification" may force a defendant "to settle rather than incur the costs of defending a class action and run the risk of ruinous liability." Fed.R.Civ.P. 23 advisory committee's note. One sound basis for granting jurisdiction under Rule 23(f) is thus the circumstance that the class certification "places inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability." Newton v. Merrill Lynch, 259 F.3d 154, 164 (3rd Cir.2001). No doubt, true "death knell" cases are few; and a reviewing court "must be wary lest the mind hear a bell that is not tolling." Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 834-35 (7th Cir.1999). But in this case-in which the aggregated and trebled claims of the four million class members are alleged to top $100 billion — a carillon is in full peal. Even a defendant who is innocent and holy may rationally choose to pay a few hundred million dollars in settlement of a class action rather than "run the risk of ruinous liability." As the district court observed (without the slightest overstatement), the "enormous financial risks" faced by the defendants "are obviously increased drastically by certification of the class." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 89. The certification order in this case may therefore coerce settlement.
 
 
 67
 (B) The district court's decision is rendered "questionable" by two errors of law that render grant of the certification an abuse of discretion.
 
 
 68
 First, the district court inadequately considered whether the class action can be manageably tried and has certified the four million member class without identifying a "`practical means'" for calculating the extent of each merchant's damages. See Abrams v. Interco, 719 F.2d 23, 31 (2d Cir.1983) (Friendly, J.) (quoting II Areeda & Turner, Antitrust Law ¶ 332c, at 157 (1978)). The majority opinion draws comfort from the conditional nature of the certification and the district court's retained power to modify it. But this is cold comfort for the defendants: the brutally coercive effect of the certification cannot be stayed.
 
 
 69
 Second, the district court ruled on certification without deciding a threshold question of law that determines whether the class members' interests will be aligned and therefore whether litigation by representative is appropriate. Courts are split on whether a tying plaintiff's injury must be measured (as I believe) by how much the tie increased the combined cost of buying both the tying and the tied products. If that is the correct measure, there can be no class here because the putative members used the tying and tied products in different proportions, and therefore have conflicting interests when it comes to how the fact and extent of any injuries are to be proven.
 
 
 70
 Because of these two legal errors, and because the majority opinion is so deferential that this appeal is no check at all on the coercion that Rule 23(f) is designed to curb, I cannot join the majority opinion.
 
 I.
 
 71
 Certification Prior to Identification of a "Practical Means" for Trying Four Million Claims
 
 
 72
 In ruling on certification, a court is required to consider "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. Pro. 23(b)(3)(D). And unless a court is "confronted with a request for a settlement-only class certification," the court must specifically "inquire whether the case, if tried, would present intractable management problems." Amchem Prods. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (emphasis added) (noting that the inquiry is unnecessary as to "settlement-only" classes, because "the proposal is that there be no trial" (citing Fed. R. Civ. Pro. 23(b)(3)(D))). For that reason, Judge Friendly instructed that if an antitrust "`class numbers in the thousands or millions,'" a court may not grant certification until "`it can devise a practical means'" for trying the action.[1] Abrams, 719 F.2d at 31 (quoting II Areeda & Turner, supra ¶ 332c, at 157).
 
 
 73
 Any case of this size and numerosity is beset by potentially intractable problems of manageability. The crucial, unresolved difficulty in this litigation concerns individualized proof of damages, an issue that "can be critical in determining whether a class of antitrust claimants should be certified." Manual for Complex Litigation § 33.11, at 303 (3d ed. 1995); see Windham v. American Brands, Inc., 565 F.2d 59, 71 (4th Cir.1977) (en banc) (holding that "in determining the manageability of a proposed [antitrust] class action," the district court must "consider proof of damages"). Specifically, a defense has been interposed that if litigated would require findings as to the extent of the damages recoverable by each of the four million members of the putative class.[2]
 
 
 74
 The law is "settled that affirmative defenses should be considered in making class certification decisions." Waste Mgmt. Holdings v. Mowbray, 208 F.3d 288, 295 (1st Cir.2000); see also Majority Op. at 138, 139 (a court must examine "defenses in determining whether a putative class meets the requirements of Rule 23(b)(3)") (emphasis added); Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996) ("Going beyond the pleadings is necessary, as a court must understand [inter alia] defenses ... in order to make a meaningful determination of the certification issues."); cf. Broussard v. Meineke Discount Muffler Shops, 155 F.3d 331, 342 (4th Cir.1998) (certification is "erroneous" when affirmative defenses "may depend on facts peculiar to each plaintiff's case") (citation omitted). And there is good reason for considering the manageability of defenses in this case: even if each merchant's claim took no more than a half a day to sort out, the damages phase of trial would last as long as the whole course of Western civilization from Ur.
 
 
 75
 The asserted defense — which the district judge acknowledged may "have force" — is that the merchants had a duty to mitigate their losses by encouraging at least some of their customers to use forms of payment other than off-line debit. In re Visa Check/Mastermoney Antitrust Litig., 192 F.R.D. at 86. We have repeatedly held that mitigation is a viable theory in antitrust actions. See Litton Systems v. AT & T, 700 F.2d 785, 820 n. 47 (2d Cir.1983) (Sherman Act § 2); Borger v. Yamaha Int'l Corp., 625 F.2d 390, 399 (2d Cir.1980) (Sherman Act § 1); see generally Neil W. Hamilton & Virginia B. Cone, Mitigation of Antitrust Damages, 66 Or. L.Rev. 339 (1984). Enforcement of the mitigation duty may be even more critical in antitrust cases than in cases sounding in contract or tort because an antitrust plaintiff seeking treble damages can profit by avoiding mitigation of loss. See Hamilton & Cone, supra at 355 (noting "the perverse impact of trebling on a plaintiff's incentive to minimize damage").
 
 
 76
 Just as we assume for purposes of class certification that the illegality of the tie is litigable, we must assume that defendants will be entitled to try their mitigation defense. The rule against pre-certification decisions on the merits is non-partisan and serves neutrally to avoid the risk that a "court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).
 
 
 77
 The majority recites the principle that a court "must examine ... defenses in determining whether a putative class meets the requirements of Rule 23(b)(3)," but finds no abuse of discretion because the district court "specifically recognized its ability to modify its class certification order, sever liability and damages, or even decertify the class if such an action ultimately became necessary." Majority Op. at 138, 139 (emphasis added) (citing In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 89 (citing Fed. R. Civ. Pro. 23(c)(1))).
 
 
 78
 This approach reflects a serious misinterpretation of Rule 23(c)(1), which permits courts to enter a "conditional" certification and then alter or amend the certification as the case proceeds. But as other circuits have repeatedly explained, individual questions "must be resolved before a class is certified, even if certification is conditional." In re Hotel Tel. Charges, 500 F.2d 86, 90 (9th Cir.1974) (emphasis added); accord Windham v. American Brands, Inc., 565 F.2d 59, 70 (4th Cir.1977) (en banc). Conditional certification therefore is emphatically not an expedient by which a court may "`avoid deciding whether, at that time, the requirements of the Rule have been substantially met.'" Castano v. American Tobacco Co., 84 F.3d 734, 741 (5th Cir.1996) (quoting In re Hotel Tel. Charges, 500 F.2d at 90); accord In re American Med. Sys., 75 F.3d 1069, 1088 n. 21 (6th Cir.1996); see Manual for Complex Litigation § 30.11, at 215 ("Although Fed.R.Civ.P. 23(c)(1) permits entry of a `conditional' class determination order and amendment before the decision on the merits, that procedure should not be used to defer a final class ruling.") (emphasis added). "`The purpose of conditional certification'" is, rather, "`to preserve the Court's power to revoke certification in those cases wherein the magnitude or complexity of the litigation may eventually reveal problems not theretofore apparent.'" Castano, 84 F.3d at 741 (emphasis added) (quoting in re Hotel Tel. Charges, 500 F.2d at 90).
 
 
 79
 The manageability problem in this case has been "apparent" from the outset and is apparent right now. The record developed so far reveals that Mastercard encouraged merchants to channel customers to the company's on-line debit alternative, which it explained was "more secure and therefore less expensive." And as plaintiffs conceded in the district court, some merchants did adopt programs that so channeled an appreciable number of would-be off-line debit transactions, thus reducing the amount of damages that those class members could collect from this suit. See Plaintiffs' Reply Memorandum of Law in Support in of Plaintiffs' Motion for Class Certification at 36-37 & n. 40. The mitigation issues are whether it is reasonable to expect other class members to have adopted similar programs, and to what extent would such programs have achieved mitigation for such class members. The district judge's recognition that the defense may "have force" is well-founded.[3]
 
 
 80
 It makes no sense to provide individualized notice to millions of merchants before the court has devised a "practical means" for trying the issues presented. See Fed. R. Civ. Pro. 23(c)(2) (requiring "individual notice to all [Rule 23(b)(3) damages class] members who can be identified through reasonable effort"). Certification that is premature does no favor to the millions of absent class members because "[u]ndesirable consequences may follow" if the class "is later decertified or redefined." Manual for Complex Litigation § 30.11, at 215. Class members who are "eliminated from the litigation as a result of decertification or reduction in the size of a class may be confused at best or prejudiced at worst." Id. Even if relief is eventually obtained for a pared down class, "those who were initially in the larger class may attempt to reverse the decision that excluded them from the class; such a reversal may be particularly troublesome if the relief was obtained by settlement." Id.
 
 
 81
 The majority opinion's view of conditional certification also seriously impairs our ability to conduct a meaningful interlocutory review under Rule 23(f). Conditional certification is not a hedge against present error. Our power of interlocutory review was conferred for a case such as this, where scores of billions of dollars are thought to be at stake and no procedure has been conceived for a fair merits adjudication. A purpose of our interlocutory look is to assure that defendants are not coerced into settlement by an improvident certification, conditional or otherwise. But if district courts can simply postpone consideration of difficult issues by making certification "conditional" (as all certifications tend to be anyway), it is unlikely that we would ever vacate such an order. At a minimum, the approach in the majority opinion will lead unnecessarily to multiple requests for appellate intervention in large-scale class actions: one after the conditional certification, and others as the district judge eventually confronts issues that were apparent before conditional certification was given.
 
 
 82
 Finally, unless there is a "practical means" of trying the case, certification leads to unfairness and injustice: if the district court later finds that a trial is unmanageable, the named plaintiffs and their counsel lose nothing, but in the meantime they have in hand the means to extract a favorable settlement of what may be weak claims. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (explaining that a "representative plaintiff" should not be allowed to "secure the benefits of a class action without first satisfying the requirements for it"). Once a certification "order is issued, the parties can be expected to rely on it and ... engage in settlement discussions on the assumption that in the normal course of events it will not be altered except for good cause." Manual for Complex Litigation § 30.17, at 223. "Judge Friendly, who was not given to hyperbole, called settlements induced by a small probability of an immense judgment in a class action `blackmail settlements.'" In re Rhone-Poulenc Rorer, 51 F.3d 1293, 1298 (7th Cir.1995) (Posner, J.) (quoting Henry J. Friendly, Federal Jurisdiction: A General View 120 (1973)); accord Rutstein v. Avis Rent-A-Car Sys., 211 F.3d 1228, 1241 n. 21 (11th Cir.2000) (referring to "the blackmail value of a class certification that can aid the plaintiffs in coercing the defendant into a settlement"). Unfortunately, the majority's excessive deference facilitates such an injustice. Cf. Szabo v. Bridgeport Machines, 249 F.3d 672, 675 (7th Cir.2001) (holding that a "prime occasion for Rule 23(f)" appellate review is when class certification "puts a bet-your-company decision to [defendant's] managers and may induce a substantial settlement even if the [plaintiffs'] position is weak").
 
 
 83
 Finally, de-certification would not doom this litigation; this is not a case in which the named plaintiffs' claims are "far smaller than the costs of litigation." Fed. R.Civ.P. 23(f) advisory committee's note. For instance, if named plaintiff Wal Mart Stores processed even 10% of its sales with credit and off-line debit, and if it established an (average) one-half percent overcharge on those transactions, its claim would reach a quarter billion dollars (with trebling and before attorneys' fees) for 1999 alone.
 
 II.
 
 84
 Conflicts Among Class Members in Proving the Fact and Extent of Injury
 
 
 85
 Certification of this class is untenable for another, entirely independent reason: under the correct measure of injury in a tying case, the class members face irreconcilable conflicts in proving the fact and extent of any injury caused by the tie. Rule 23(a) therefore prohibits litigation by representative because no representative can adequately protect the interests of the millions of absent class members. See General Tel. Co. v. Falcon, 457 U.S. 147, 156-57 & n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (Rule 23(a) tests "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence").
 
 
 86
 There is little dispute that plaintiffs can use common proof to litigate the threshold question as to whether there is an illegal tie.[4] Consequently, the "principal" issue for consideration by the district court in weighing certification was whether the plaintiffs also could prove that the allegedly illegal tie caused the class "injury in fact" the "gravamen of a tie-in action." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 81 ("[E]ven an antitrust plaintiff who has successfully proven illegal conduct on the part of the defendant must also show that it was `injured in fact' by the illegality."); Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.1982). The injury in fact element is satisfied by "proof of some damage flowing from the" defendant's conduct, see Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); under the Rules Enabling Act, this requirement applies to class actions as well as to litigation by named parties only. See Alabama v. Blue Bird Body Co., 573 F.2d 309, 318 (5th Cir.1978); Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir.1977). Plaintiffs therefore concede that their class of four million merchants cannot be certified unless plaintiffs rely on a theory that posits at least some injury to every class member. However, the district court avoided or has delayed deciding how injury in fact would be measured. In this litigation, that is a vexed question.
 
 
 87
 In many tying cases, measuring the impact of the tie is fairly mechanical because the buyers have used the two products in fixed proportions. See, e.g., United States v. Microsoft Corp., 147 F.3d 935 (D.C.Cir. 1998) (one computer operating system; one internet web browser); Town Sound and Custom Tops v. Chrysler Motors Corp., 959 F.2d 468 (3d Cir.1992) (en banc) (one car; one automobile sound system). But the question is troublesome here, and should have been considered in the context of class certification, because these plaintiffs have used the credit cards (the tying product) and off-line debit cards (the tied product) in different proportions; fine jewelers, for example, would rarely be presented with an off-line debit card. See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 83. The varying proportions of use create intractable conflicts among the four million merchants agglomerated as a class by the district court.
 
 
 88
 In my view: (1) The court's failure to decide how injury in fact would be measured was an error of law and thus an abuse of discretion; (2) the correct measure of injury is the extent to which a merchant would have paid less for the "package" of the tying and tied products in the absence of the tie; and (3) plaintiffs who use tied and tying products in varying proportions have conflicting interests in how the class goes about proving the fact that they would have paid less for their particular "package," as well as in showing the extent of any disparity. Since Rule 23(a) requires that members of a class "possess the same interest and suffer the same injury," class certification is not an option in this case. Amchem Prods. v. Windsor, 521 U.S. 591, 625-26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).
 
 
 89
 A. The "Measure of Injury" Applied in the District Court
 
 
 90
 The need to show injury to all class members has been problematic for plaintiffs from the outset, and their theory of injury has mutated as class counsel has tried gamely to fix the problem. The Second Amended Class Action Complaint alleged that "absent the tie, virtually all members of the putative class would have refused the off-line debit cards and processed the same transactions using cash, checks, on-line debit, or other payment forms." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 82 (emphasis added). In the course of briefing the class certification motion, however, defendants demonstrated that there could be no class-wide injury under that scenario because (inter alia) "even some named plaintiffs have testified that they would have continued to accept off-line debit cards at current prices even absent the tie." Id.
 
 
 91
 Plaintiffs then sponsored an expert's affidavit positing that all plaintiffs would have continued to accept off-line debit cards even absent the tie, but that the defendants would have charged a lower fee for them. See id. Specifically, the expert articulated the following theory of injury in fact: "in the `but-for,' untied world," Visa and Mastercard "would have cut their interchange fees in order to preserve universal acceptance." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 82. "That move," according to the expert, "would have led merchants to accept the cards once again." Id. This theory thus posited "class-wide injury resulting from every single class member's overpaying for off-line debit cards as a direct result of the tie." Id. Plaintiffs supported their argument by pointing to tying cases that measure injury solely by the inflated price paid for the tied product. See, e.g., Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir.1981) ("[T]he measure of damages is the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market."). But see X Phillip E. Areeda et al., Antitrust Law ¶ 1769c, at 430 (1996) (calling the "tied product" measure of injury "quite wrong").
 
 
 92
 Defendants responded that the tied product "overcharge" measure of injury is flawed because it ignores what would happen to the price of the tying product in the untied world. "As a matter of elementary economic theory," defendants argued that a seller who "has market power in the tying product and overcharges on the tied product will do two things if the tie is broken: decrease the price of the tied product and increase the price of the tying product." Id. at 83. And since a plaintiff cannot show injury in fact if "his `loss' from the defendant's violation is offset by his `gain' in the very transaction he attacks," II Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 365c, at 245 (rev. ed.1995), the defendants contended that the tying product price had to be considered. Several authorities agree that injury must be measured by reference to the "package" price of the two products. See, e.g., Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.1982) ("[I]njury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value."); accord II Areeda & Hovenkamp, supra ¶ 383b, at 340-41 (approving this measure of injury). The issue is open in this Circuit. See In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 83 n. 13.
 
 
 93
 If credit card fees would have been higher in the untied world, certification would depend (as the district court fully recognized) on which measure of injury is adopted because under the "package" measure
 
 
 94
 the fact of injury would no[t] be susceptible to class-wide proof. Specifically, merchants with relatively high amounts of credit card transactions vis a vis debit card transactions (e.g., jewelry stores) would have suffered little or no injury from the tie; indeed, they would have benefitted from it to the extent it kept credit card interchange fees down.
 
 
 95
 Id. at 83.
 
 
 96
 The district court did not decide which measure of injury applies, however, because in its view the question was obviated by a new proffer in plaintiffs' expert's reply declaration. According to plaintiff's new (third) conception of the untied world, defendants would have lowered off-line debit fees but "would not have raised the credit card" fees. Id. at 84 (emphasis added). The district court deemed this a "sufficient theory of class-wide injury under either the `package' or the `tied product' measure of injury" because under this theory even merchants with relatively high credit card volume would have been injured. Id. at 85 & n. 15. Accordingly, the district court saw no need to "choose between the competing line[s] of cases." Id.
 
 
 97
 The district court's refusal to decide how injury in fact would be measured was an error of law and thus an abuse of discretion. See Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir.1996) ("In order to make the findings required to certify a class action under Rule 23(b)(3) one must initially identify the substantive law issues that will control the outcome of the litigation."). The decision was critical to the class certification motion, and involved a pure question of law; no purpose was served by a delay pending future factual development.
 
 
 98
 If the court had decided this question, and decided (correctly) that injury is measured by the package price (rather than by the price of the tied product alone), see Part II.B below, it would have encountered a subtle problem, unique to variable proportion tying cases, that is fatal to certification, see Part II.C below.
 
 B. The Correct Measure of Injury
 
 99
 I would hold that the correct measure of injury in fact is the package price of the tying and tied products. The statutory text compels this rule. The injury in fact requirement is derived from § 4 of the Clayton Act, 15 U.S.C. § 15, which provides a damages cause of action only to plaintiffs who have been "injured in [their] business or property by" an antitrust violation. Id.; see J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); II Areeda & Hovenkamp, supra ¶ 363, at 219-27. Awarding "damages to an uninjured plaintiff is inconsistent with the statutory requirement." II Areeda & Hovenkamp, supra 365c, at 247. Accordingly, "the tied buyer is injured in fact only when he is forced to pay above-market prices for the sum of the tying and tied products." X Areeda et al., supra ¶ 1769c, at 430 (citation omitted).
 
 
 100
 The price of the tying product must be taken into account because it usually does rise if the tie is broken. A rational person cannot be made to pay more for a package of two products than he would pay for the two products separately. So if a tie causes the buyer to pay more than the market price for the tied product, the buyer is most likely paying less than the price that the seller could profitably charge for the tying product if sold separately. Otherwise, the buyer would avoid the tie.[5] And if somehow a plaintiff actually shows that decoupling would cause the tying product price to fall, he should be entitled to recover that much more.
 
 
 101
 Based on the text of § 4 and these economic principles, "an increasing number of courts have correctly held that the purchaser has not been injured in fact, and thus cannot recover damages, unless he shows that the combined `payment for both tying and tied products exceeds their combined fair market value.'" II Areeda & Hovenkamp, supra ¶ 383, at 341 (quoting Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir.1982)) ("A determination of the value of the tied products alone would not indicate whether the plaintiff indeed suffered any net economic harm, since a lower price might conceivably have been exacted by the [seller] for the tying product."); see also Will v. Comprehensive Accounting Corp., 776 F.2d 665, 673 (7th Cir.1985) ("[U]nless the plaintiff shows that the package price was elevated the suit must be dismissed without further ado."); Siegel v. Chicken Delight, 448 F.2d 43, 52 (9th Cir.1971) ("To ascertain whether an unlawful arrangement for the sale of products has caused injury to the purchaser, the cost or value of the products involved, free from the unlawful arrangement, must first be ascertained."). The competing line of cases, which measure injury by the price of the tied product alone, are, in Professor Areeda's phrase, "quite wrong." X Areeda, et al., supra ¶ 1769c, at 430.
 
 
 102
 C. The "Package" Measure of Injury Applied to Variable Proportion Tying Cases
 
 
 103
 If injury were measured (erroneously) by reference to the tied product alone, the interests of the class members would be aligned. Every class member processed at least some off-line debit transactions, so every class member would want the class representatives to prove that in the absence of the tie, the price of the tied product would have been as low as economic theory could support. The fact that the class members happened to process credit cards and off-line debit cards in varying proportions would be irrelevant. Indeed, as compared to the "package" measure or to a non-price theory of injury, a "claim of overcharge on the tied product is the most likely prospect for common treatment of the fact of damage." John H. Matheson, Class Action Tying Cases: A Framework for Certification Decisions, 76 Nw. U.L.Rev. 855, 885-86 (1982) (emphasis added).
 
 
 104
 However, under the package measure described in Part II.B above, the variation among merchants of the proportion of sales using credit cards (versus off-line debit cards) has great bearing on proof of common injury. See Matheson, supra at 887; cf. Herbert Hovenkamp, Tying Arrangements and Class Actions, 36 Vand. L.Rev. 213, 249-50 (1983) (concluding that buyers subject to "variable proportion tie-in[s]" cannot prove injury in fact on a class-wide basis, and suggesting as an alternative attack the use of offensive collateral estoppel under Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (emphasis added)). To show injury, the class representatives will have to establish what both interchange fees would have been in the "but-for," untied world — and therein lies the conflict.
 
 
 105
 Any given set of credit and debit fees that class counsel might seek to prove would have different anticipated impacts (i) on the merchant whose debit-card sales predominate, (ii) on the merchant whose credit-card and debit-card sales are in parity, (iii) on the merchant whose credit-card sales predominate — and on each merchant along the continuum. In proving injury and damages, any given economic assumption or analysis will (as the case may be) enhance, impair or preclude the antitrust claim of a merchant depending on that merchant's location along the continuum.
 
 
 106
 Like other class members, the merchant whose debit-card sales predominate benefits by showing that the debit charge would have been much lower; but, unlike other class members, the merchant whose debit-card sales predominate can still achieve a substantial recovery even if the price of credit would have risen by an even greater amount. Therefore, this merchant is not compelled to make the "`elusive and seldom attempted'" proof that "the sum of tying and tied product prices would have been lower" absent the tie. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 85 (quoting X Areeda et al., supra ¶ 1769b, at 429). (I illustrate the point with a numerical example in the margin.[6])
 
 
 107
 In contrast, the merchant whose credit-card and debit-card sales are in parity would get nothing if decoupling caused credit charges to rise by as much as debit prices fell. To establish injury in fact, this merchant would be compelled to undertake the "`elusive and seldom attempted'" proof that the sum of the untied prices would have been lower. As to the extent of injury, he would be indifferent to the relative prices of credit and debit and would do best by proving that the combination would have been as low as possible.[7]
 
 
 108
 The merchant whose credit-card sales predominate faces the toughest constraints. For this merchant, it is necessary but insufficient to make the "`elusive and seldom attempted'" proof that the sum of the prices would have been lower. He would need to argue also that decoupling would cause the debit price to fall without causing any appreciable rise in the credit price, because even a minuscule rise in the credit price would neutralize a reduction (even a gross reduction) in the debit price. This is a tough row to hoe.[8] (This is plaintiff's third theory, the one first advanced in the reply affidavit of plaintiffs' expert.)
 
 
 109
 The three merchants at these three points on the continuum thus have different cases; their anticipated recoveries depend on and are maximized by different theories and economic assumptions; those theories and assumptions are incompatible or (at best) incoherent when advanced at once; there are winners and losers within the class; and the distribution of these competing interests creates a problem that cannot be resolved by subclass representatives even if one had a thousand of them. See Amchem Prods. v. Windsor, 521 U.S. 591, 625-26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (members of a class must "possess the same interest and suffer the same injury"); General Tel. Co. v. Falcon, 457 U.S. 147, 156-57 & n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). As far as I can see, the only unified interests served by herding these competing claims into one class are the interests served by settlement: (i) the interest of class counsel in fees, and (ii) the interest of defendants (perhaps later in the litigation) in a bundled group of all possible claimants who can be precluded by a single payment.
 
 
 110
 Certification does no service for the absent class members' claims, viewed separately. Already, the difficulty of having to prove injury under the package measure has led plaintiffs' counsel to propose a least-common-denominator analysis that is theoretically capable of bestowing some benefit on all class members, to the detriment of class members who would have a superior claim of recovery under other, competing analyses. Thus, plaintiffs undertake to make the "`elusive and seldom attempted'" showing that the sum of the two fees would have been lower and that the credit card price would not have risen at all. If, as plaintiffs' counsel evidently believes, this analysis is the only way to keep the class together, I take the point as proven that the interests of the class members are fractured and conflicted. As to the analysis itself, I have no view of its merits in this particular case. But for most absent members of the class, the analysis is unnecessary and impedes recovery under other theories that offer better prospects of recovery.
 
 
 111
 In light of the intractable conflict, I would order the district court to decertify the class. But lacking a majority on this Court for that result, I am relieved to think that the certification order is conditional and that nothing inhibits the district court from considering and reconsidering all of these issues over time, as indeed the district court is evidently disposed to do.
 
 III.
 Conclusion
 
 112
 The majority opinion exudes confidence that there is some way to bring this unmanageable and conflict-ridden litigation to an end, and that it will materialize one day in the district court. I think that is probably right, but I intuit that the only case-management tool that will bring about that end will be settlement, and that it will be coerced by abuses that Rule 23(f) was specifically designed to correct.
 
 
 
 Notes:
 
 
 [1]
 Many district courts have ignored Judge Friendly's admonition inAbrams. But as the trial judge in this case recognized, those courts "state the rule that individual damages questions will not bar class certification in conclusory fashion without assessing whether individual questions would predominate if each damages action had to be tried separately." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 86 n. 19 (emphasis added); cf. Szabo v. Bridgeport Machines, 249 F.3d 672, 675 (7th Cir.2001) (granting Rule 23(f) review because "the district court's decision to certify the class implie[d] that important legal principles have evaded attention by appellate courts. At critical junctures the district judge cited only decisions by other district judges, most in cases later settled and thus not subject to appellate consideration.").
 
 
 [2]
 The right to assert the defense against each and every class member is guaranteed by the Rules Enabling ActSee Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1014 (2d Cir.1973) (recognizing that under the Act, Rule 23 cannot "`abridge, enlarge or modify any substantive right'") (quoting 28 U.S.C. § 2072), vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).
 
 
 [3]
 I agree with the majority that the "honor all cards" rule precluded any merchant from mitigating his alleged losses down to zero,Majority Op. at 17, but the issue that challenges manageability is the effect of channeling on the amount of damages. See in re Visa Check / Mastermoney Antitrust Litig., 192 F.R.D. at 86 ("The fact of injury is binary; it is either there or it is not. The extent of injury is another question.").
 
 
 [4]
 I also assumearguendo that plaintiffs can use common proof to show that the tie had an anticompetitive effect on the relevant market, a showing required of all private antitrust enforcers regardless of whether they pursue a "per se" or rule of reason claim. See Balaklaw v. Lovell, 14 F.3d 793, 801 & n. 17 (2d Cir.1994).
 
 
 [5]
 The Areeda treatise offers the following example:
 Suppose a defendant's profit maximizing price for product A alone is $100 and that the prevailing market price for product B is $20. If the defendant's version of product B is worth $1 less to the plaintiff than rival brands (or if a tie is otherwise burdensome in the amount of $1), the defendant tying the two together cannot profitably charge more than $119 for the package. Phrased another way: if he charges $25 for tied product A, he must reduce the price of tying product A to $94.
 II Areeda & Hovenkamp, supra ¶ 365 at 246 n. 48 (emphasis added). Thus, if the tie is broken, the price of the tying product will increase back to $100.
 This example describes a fixed proportion tie, but even in the variable proportion context "tied-product premiums are often offset by tying-product discounts below the price that would have prevailed without tying." X Areeda et al., supra ¶ 1769 at 431.
 
 
 [6]
 Suppose that the interchange fees in the tied world (the actual world) are $10 per $100 purchase for both credit cards and off-line debit cards (in fact, the percentages are much smaller but the $10 figure is useful for illustrative purposes). Thus, regardless of an individual merchant's mix of credit and debit, for every 100 transactions he pays 100 × $10 or $1000
 To establish injury in fact under the package measure, any merchant would have to show that in the untied world, he would have paid less than $1,000. As noted in the text, this will require establishing what both interchange fees would have been in the untied world, i.e., the fee on credit cards would have been "$C" and the fee on off-line debit cards would have been "$D".
 To assess the effect of different price combinations on the merchant "whose debit-card sales predominate," let us say that for every 100 transactions, he processes 30 by credit and 70 by off-line debit. In showing the fact of injury, this merchant could select (if provable) combinations of "$C" and "$D" that would sum over $20, thus obviating the need to make "`elusive and seldom attempted'" showing that "the sum of tying and tied product prices would have been lower" absent the tie. In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 85 (quoting X Areeda et al., supra ¶ 1769b, at 429). For example, if C = $19 and D = $5, then C + D would be $24 but this merchant would have been injured in fact by $150 (30 × $19 + 70 × $4 = $570 + $280 = $850).
 In terms of the extent of his injury, the 30%/70% merchant would greatly prefer a theory positing that C would have been $16 and D would have been $3 to a theory that the prices would have been $10 and $9, even though in both cases the sum would be $19. He could recover $310 under the former version of events (30 × $16 + 70 × $3 = $690), but only $70 under the latter (30 × $10 + 70 × $9 = $930).
 
 
 [7]
 By plugging in the hypothetical prices of credit and debit discussed in the previous footnote, it is easy to see how the interests of this merchant differ from those of the merchant whose debit sales predominate. For every 100 transactions, this merchant processes 50 credit sales and 50 debit sales. If C would have been $19 and D $4, this merchant would actually have paidmore in the untied world then he did under the tie (50 × $19 + 50 × $4 = $1,150). In the words of the district court, he "would have benefitted from [the tie] to the extent it kept credit card interchange fees down." In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 83.
 And while the respective prices of credit and debit mattered a great deal to 30%/70% merchant in showing the extent of injury, they would not matter at all to the 50%/50% merchant. The latter would recover $50 by advancing an economic theory that the prices would have been $16 and $3 (50 × $16 + 50 × $3 = $950) or $10 and $ 9 (50 × $10 + 50 × $9 = $950). The 50%/50% merchant could make a disinterested determination of which of the two theories would be easier to prove.
 
 
 [8]
 Assume that this merchant processed 70 credit transactions for every 30 debit sales. If decoupling would have resulted in prices of $19 and $4, then this merchant would have beenhurt by a whopping $450 (70 × $19 + 30 × $4 = $1,450). He also would have been hurt if the prices had been $16 and $3 (70 × $16 + 30 × $3 = $1,210) or even $16 and $0 because 70 × $16 is more than $1000. On the other hand, if the prices were $10 and $9, he could recover $30 (70 × $10 + 30 × $9 = $970), placing his preferences directly at odds with the preferences of the 30/70 merchant (who preferred the $16 and $3 prices to the $10 and $9). By extension, a merchant whose ratio of credit to off-line debit transactions was extremely high would not be able to recover under any theory positing a credit card fee of over $10 unless the debit card fee became virtually a free good.