**Frederick LEE, Plaintiff,**

v.

**John PEREZ, et al., Defendants.**

**No. 00 CIV. 2749(CM).**

United States District Court,
S.D. New York.

Nov. 15, 2001.

DECISION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR
NEW TRIAL

MCMAHON, District Judge.

Plaintiff Frederick Lee, having lost before a jury on claims arising out of alleged constitutional violations in connection with his November 20, 1998 arrest, brings a motion pursuant to Fed. R. Civ. P 50(b) for a new trial. Lee seeks a new trial against one defendant, Corrections Officer ("CO") Gerald C. Kehlenbeck. CO Kehlenbeck was the officer who conducted a strip search of plaintiff at the Orange County Correctional Facility ("OCCF") on November 21, 1998, the morning after his arrest. Plaintiff alleged that the strip search was unconstitutional, both because prisoners at OCCF were routinely strip searched and because there was no particularized probable cause to subject him to such a search. Defendants countered that strip searches were not routinely conducted on all prisoners at OCCF in 1998, and urge that there was sufficient evidence for a jury to conclude that CO Kehlenbeck had probable cause to conduct the strip search. The jury found for Kehlenbeck on the latter ground.

Motions for new trial should be granted when, in the opinion of the District Court, the jury has reached a seriously erroneous result, or if the verdict was a miscarriage of justice. *Atkins v. City of New York*, 143 F.3d 100 (2d Cir.1998). A

trial court may find a miscarriage of justice if the jury's verdict was seriously erroneous or against the weight of the evidence. *Stratton v. Dept. for the Aging for the City of New York*, 922 F.Supp. 857 (S.D.N.Y.1996). A new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, the district court is free to weigh the evidence and need not view it in the light most favorable to the prevailing party. *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998). Nonetheless, a trial judge should only grant such a motion when the jury's verdict is "egregious," such that enforcement of the judgment would constitute a miscarriage of justice. *DLC Mgt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir.1998).

In this case, the Court concludes that the jury's verdict was seriously erroneous, and could not be sustained by any view of the evidence. Indeed, no evidence whatever supports the verdict. Therefore, the motion is granted.

## SUMMARY OF EVIDENCE

The facts pertinent to the motion are as follows:

Frederick Lee was arrested on November 20, 1998, as a result of an altercation with the police at the apartment of his cousin, Ms. Ayesha Fulford. Ms. Fulford had been evicted from the apartment by order of the City Court of the City of Newburgh, New York. She asked Mr. Lee to remove some food items from the apartment that had not been taken out the night before, and to "secure" the apartment. (Tr. 28–31) When Mr. Rios, the landlord, refused to let Mr. Lee into the apartment, plaintiff refused to take no for an answer, and the two men got into a fight. Mr. Lee called the Newburgh Police on his cell phone (Tr. 32–33), but he was the one who ended up under arrest, after he tried to leave the area when instructed not to do so. He was taken to the City of Newburgh Police Department, where he was booked on charges of obstructing governmental administration, disorderly conduct and criminal mischief. (Stip. Fact. No. 1; County DX 10) Disorderly conduct is a violation (N.Y. Penal Law § 240.20) and the other two charges are Class A misdemeanors. (N.Y. Penal Law §§ 145, 195.05)

At the time he was processed for his arrest, Lee had on his person approximately $1200 in cash, a cell phone and a beeper. (County DX 8[1]) He had a prior conviction for grand larceny (Tr. 64 and was unemployed at the time of his arrest. (Tr.78))[2]

Lee spent the night in the holding cell adjacent to the City Court in Newburgh. The next morning, Lee appeared for arraignment in the Newburgh City Court. Bail was set at $250. (Tr. 50) Lee asked if he could make his bail then and there, using the money that had been taken from him upon his arrest. He was told that bail could be paid only at the OCCF. (Tr. 50–51)

---

**1.** The inventory is found on an exhibit filled out at OCCF. However, CO Kehlenbeck testified that he received the property from the Newburgh Police, not directly from plaintiff. (Tr. 249)

**2.** The transcript reference is to a question and answer from Mr. Lee's deposition that were read into the record. The deposition was not introduced into evidence. Since Mr. Lee's prior testimony is not hearsay (Fed. R.Ev.801(d)(2)), and since his lack of employment at the time of his arrest was referred to repeatedly, without objection, during the trial, the Court assumes that counsel for the Newburgh Defendants intended that the statement be received for all purposes for which it could be considered—including the truth of the matter asserted.

Lee was transported to OCCF later that morning by two Newburgh police officers (Tr. 52–53). He arrived at approximately 11 AM. (Tr. 247) When he arrived, he was in-processed at a desk, and then returned to a cell. (Tr. 53–54)

Shortly thereafter, Mr. Lee was taken to another room, where he was left alone with a corrections officer (whom Lee could not identify). The Orange County defendants (including Kehlenbeck) stipulated that Kehlenbeck had in-processed plaintiff, and that this process included a "personal hygiene check/visual body search." (Stipulated Fact No. 6) Thus, Orange County did not dispute that Kehlenbeck conducted whatever inspection of plaintiff's person occurred on November 21, 1998, even though Lee could not identify the officer involved.

At trial Kehlenbeck testified that a "personal hygiene check" is required of all prisoners arriving at OCCF. (Tr. 252) This inspection, according to Kehlenbeck, consists of an inmate's removal of his clothes, followed by a visual inspection of his body. (Tr. 242) The prisoner must "strip" for the CO to conduct the "personal hygiene check." The prisoner is issued a prison uniform at the time he strips for the "personal hygiene check." (Tr. 245)[3]

According to Kehlenbeck, a personal hygiene check is not the same thing as a strip search. He described the difference as follows: "Hygiene check would not con-

sist of the inmate opening his mouth or bending over and spreading his buttocks or looking under his genitals. A strip search would...." (Tr. 244). According to Kehlenbeck, however, a "personal hygiene check" did involve the inmate's removing all his clothing. (Tr. 242)

While Kehlenbeck routinely performed a "personal hygiene check" on all incoming prisoners, he did not routinely conduct a visual body cavity inspection. (Tr. 252) However, he might determine that such an inspection was necessary, based on information that came to his attention, or observations made, while he was performing the personal hygiene check.(Tr. 245). Circumstances indicating the need for a body cavity inspection—a "strip search," in CO Kehlenbeck's parlance—included, "If an inmate is acting peculiar, nervous, jittery, it may lead me to believe that he is hiding something on his person, contraband, drugs, weapons, and then I would go further with my search of the inmate."[4] (Tr. 246) Kehlenbeck specifically denied relying on the circumstances of the inmate's arrest in making the decision to strip search (Tr. 258) and admitted that he would not ordinarily know whether an inmate had a record during the course of processing him upon arrival. (Tr. 250)

Sheriff Frank Bigger of the Orange County Sheriff's Department (OCSD), who was also a defendant in the case, testified at the trial concerning practices and procedures promulgated by the OCSD for use at

---

**3.** According to Sheriff Frank Bigger, Kehlenbeck's ultimate superior, it is not routine to have a corrections officer in the room with an arriving inmate when he changes into prison garb. (Tr. 177)

**4.** At his deposition, Kehlenbeck testified that he routinely conducted body cavity checks on all arriving OCCF inmates, and that the "personal hygiene check" conducted on every prisoner included an examination of the anus, mouth and genitals. (PX 20 at 11, see also

Tr. 255–257). The jury was free to consider the deposition testimony for purposes other than impeachment, since plaintiff introduced the entire deposition transcript as an exhibit. The testimonial conflict is obvious, but was for the jury to resolve. Since the jury found against plaintiff, I can only conclude that the jurors believed Kehlenbeck's trial testimony and disbelieved his deposition testimony. I find CO Kehlenbeck's change of story somewhat harder to swallow than the jury did.

OCCF. He said, in pertinent part, that there were two different types of searches performed on arriving inmates. He, like Kehlenbeck, called them "personal hygiene checks" and "strip searches." (Tr. 172). However, Bigger testified to a different understanding of what the two types of searches entailed than CO Kehlenbeck had. He said that a "personal hygiene check" was "for sores, for bruises, for any diseases." (*Id.*). Bigger states, "When a prisoner is brought in, he's visibly observed, and if the correction officer finds any type of bruises, any types of marks, any kind of intrusions in the body, we then—— what we call the sixth sense of a correction officer, will continue the check to see what is the actual damages done to the body and stuff like than." (*Id.*) When asked whether an inmate would be required to remove clothing for a "personal hygiene check," Bigger replied, "Yes, he can remove a shirt." (Tr. 176) Bigger defined a strip search as, "Strip search is when you take him into another room where there's only the corrections officer and the inmate himself and his clothes is taken off and his body is observed for various things such as we said before; markings and any needle marks or bruises and so forth." (Tr. 173) Asked if strip searches " . . . .looked for anything else perhaps contained on an inmate's person," Sheriff Bigger replied, "Sure—if there's any contraband or any weapons that can be concealed so that again it's for the safety of the correctional facility and for the inmates and for the correction officer." (*Id.*) Bigger denied that prisoners were routinely subjected to strip searched. He acknowledged, however, that a personal hygiene check (as he described that search) was conducted on every newly-arrived inmate.[5]

Notwithstanding the County's insistence on using the term "personal hygiene check" to describe the search performed on Mr. Lee, Kehlenbeck had absolutely no recollection of plaintiff and could not testify of his own recollection what he had done to Lee that day—even after looking at all the OCCF records of Lee's confinement. (Tr. 241–242, 245–46). Thus, Lee and Kehlenbeck were the only witnesses to

---

5. The jury returned a defendant's verdict on plaintiff's allegation that Bigger had instituted a policy and practice of strip searching every new inmate at OCCF. In so doing, the jury appears to have credited Sheriff Bigger's trial testimony over his deposition testimony, which was introduced into evidence by plaintiff on his case-in-chief (PX 21). The relevant deposition testimony, which is wildly at variance with Sheriff Bigger's trial testimony, reads as follows:

> Q: Would the inmate be required to remove all of his or her clothing for that search?
> A. Yes
> Q. Would that include exposing the genital area and bending over and spreading the cheeks . . . . . . . . . . . . Would the genital area be visually inspected when the inmate first arrived at the jail?
> A. Yes. (PX 21 at 6 lines 20–23, and 7, lines 14–16)

Bigger further testified as follows:

> Q. Should a male inmate be required to spread the cheeks of his buttocks apart for visual inspection of a new inmate being received?
> A. I would believe so, that it's done in every case, I'm not positive of it, but either that or by the visual look of the body, and again comes down to what the correction officer feels should be done further. (PX 21 at 12, lines 5–13)

Finally, Bigger admitted that this policy had been in place when he took office in 1995 and had not changed during his tenure as sheriff. (Px 21 at 8, line 11)

At the trial, Bigger suggested that he had been discussing medical screening, not strip searches, when he gave the answers to those questions at his deposition. (Tr. 183) However, at no point in the deposition transcript did plaintiff's attorney ask Bigger a question about medical screening, so the "justification" for this testimony is as best disingenuous, and at worst something far more sinister.

what went on when they were alone together—and Kehlenbeck had nothing to say on that score. Lee's version of what happened to him at OCCF went unrebutted.[6]

Lee testified that he was ordered to strip and to open his mouth and his buttocks to permit visual inspection of the mouth and anal areas. (Tr. 55–56) This testimony, of course, does not accord with the County's insistence that Kehlenbeck performed a "personal hygiene check," even as Kehlenbeck understood that term. It goes far beyond Sheriff Bigger's belief that an inmate would remove no more than his shirt during a "personal hygiene check." Kehlenbeck was unable to deny that he performed the more intrusive strip search described by plaintiff, and Lee's account was confirmed by at least three other pieces of evidence.

First, Kehlenbeck created a contemporaneous record of the search, PX 10, on which he indicated that he had conducted a "strip search" of plaintiff, not a "personal hygiene check." While Kehlenbeck testified that the "Strip Search Report" form was used "back then" to record the results of the "personal hygiene check," (Tr. 254), the form says that a strip search was performed, and Kehlenbeck did not cross out those words and insert the description of some allegedly less invasive activity.

Second, CO Kehlenbeck's ultimate superior officer, Sheriff Frank Bigger, testified that a strip search was the type of search conducted when an inmate went into a room with only one corrections officer and took off all his clothes. (Tr. 173) Since Lee was taken into a room where he was left alone with Kehlenbeck and was ordered to remove his clothing, the only fair inference is that he was strip searched.

Third, Sheriff Bigger acknowledged that at one time there had been a policy of strip searching all new arrivals at OCCF (PX 21 at 8), and Kehlenbeck testified that there had been no changes in the policy regarding the search of new arrivals at OCCF since he (Kehlenbeck) started working at the jail some 12 years ago (which would be about 9 years prior to the time of the incident in question). (Tr. 258)

Thus, all of the evidence in the case supports Lee's testimony that he was stripped (which in and of itself goes beyond a "personal hygiene check" as Sheriff Bigger used that term) and that his body cavities were examined.[7]

In an effort to overcome CO Kehlenbeck's complete lack of memory about the events of November 21 and his dealings

---

**6.** The fact that Lee's story was not rebutted does not mean the jury had to believe him. However, as will be seen, there is substantial evidence in the record confirming that Lee was in fact strip searched. Moreover, while the County defendants did not stipulate to the fact of the search, they never seriously contested the point.

**7.** Stipulated Fact No. 6 is not to the contrary. It simply says that Kehlenbeck performed a personal hygiene check on plaintiff. But while Kehlenbeck had no recollection of plaintiff's particular situation, he has an ordinary practice of conducting a "personal hygiene check" at the beginning of the booking process, as soon as the prisoner enters the

facility. (Tr. 244) Kehlenbeck further testified that he would decide, while conducting the "personal hygiene check," whether he should go further and perform a more intrusive strip search. Asked what factors he would consider in making that determination, he replied, "If the inmate is acting peculiar, nervous, jittery, it may lead me to believe that he is hiding something on his person, contraband, drugs, weapons, and then I would go further with my search of the inmate." (Tr. 245) Kehlenbeck specifically denied considering the circumstances of the inmate's arrest or the nature of the charges lodged against the prisoner in making the decision to strip search. (Tr. 258)

with Mr. Lee, the Assistant District Attorney asked him a hypothetical question as follows:

OK, Officer, I'd like you to assume the following facts in evidence: Assume that an inmate arrives at the Orange County Jail with a prior felony conviction; assume that the inmate had in his possession at the time of the arrest $1200 in cash, a cell phone and a pager; I would like you to also assume that the inmate reported that he was not employed at the time of his arrest; and he is also complaining of physical injuries as a result of a police assault. Based on the following [sic] facts, Officer, would you have conducted more than a personal hygiene check of this particular individual? (Tr. 252–53)

Of course, CO Kehlenbeck could not say whether he actually knew any of that information at the time he conducted the strip search on Mr. Lee. The County Attorney apparently wanted the jury to conclude that Kehlenbeck must have known about and considered these matters, since he obviously had decided to conduct a strip search. Aside from the logical fallacy of such an argument, it was contradicted by Kehlenbeck's own testimony that he would neither have had nor considered information about the circumstances of the arrest or Lee's prior record at the time he made the determination to strip search.[8] The court sustained the plaintiff's objection to this effort at creating a record where there was none, noting, "He's not testifying as an expert. He's a fact witness who has no memory." (Id.)

The parties stipulated that Lee made bail, using the money that had been taken from him at the time of his arrest. He was released within two hours of his arrival at OCCF. (Stipulated Fact No. 7) There is no evidence in the record to indicate that Mr. Lee ever entered the general prison population, or for that matter left the in-processing area at OCCF.

### Trial Motions

Plaintiff did not move for a directed verdict at the close of all the evidence. Accordingly, the matter was submitted to the jury.

### County's Argument to Jury

In her closing argument, the Assistant Orange County Attorney did not contest the fact that Kehlenbeck had conducted a strip search on ‚Lee. Instead, she argued that a confluence of factors—defendant's record, his lack of verifiable employment, and the fact that he possessed a large amount of cash, a beeper and a cell phone—justified the belief that Lee might possess contraband. She made this argument without objection, despite the fact that the Court had previously sustained an objection to her obtaining "expert" testimony from CO Kehlenbeck about what he might have chosen to consider in making that decision, and despite the fact that there was absolutely no evidence that Kehlenbeck had in fact been aware of, let alone considered, any of those factors—while there was evidence that he was not aware of at least two of those factors.

### Verdict

The jury was given a special verdict form, as is customary in multiple defendant civil rights cases like this one. The questions relating to CO Kehlenbeck were answered as follows:

1. Did Orange County Defendant KEHLENBECK conduct a strip search of

---

**8.** Kehlenbeck testified subsequently that the only hard information that he had about the plaintiff's arrest at the time he made the decision to strip search was that contained on the securing order (DX 10).

Plaintiff FREDERICK LEE on or about November 21, 1998?

Yes    X    No _____

1a. Did Orange County Defendant KEHLENBECK conduct the aforesaid strip search without having reasonable cause to believe that Plaintiff FREDERICK LEE was concealing weapons or other contraband, based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest?

Yes _____     No   X  

The jury thus returned a verdict in favor of Defendant Kehlenbeck. Judgment dismissing the complaint was entered on June 27, 2001. This motion for a new trial pursuant to Fed.R.Civ.P. 59 was timely made on July 6, 2001.

### The Motion is Granted

■ I grant the motion for a new trial because there was no evidence in the record from which the jury could have concluded that CO Kehlenbeck relied on permissible factors in making his decision to perform a body cavity search on plaintiff.[9]

The United States Court of Appeals for the Second Circuit has ruled that strip searches of individuals charged with misdemeanors or other minor offenses are lawful only when " . . . . officers have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest." *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986). The law to that effect has been well settled for some time, *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988); *Wachtler v. County of Her-*

*kimer,* 35 F.3d 77 (2d Cir.1994), and a number of municipalities, including the Monroe County, the City of New York and Nassau County, have sustained large money judgments as a result of policies of strip searching all arrestees without having case-specific probable cause to suspect carriage of contraband. Only last month, the Court of Appeals held that the law on this point was so well-settled by July 1995— some three and one half years prior to Kehlenbeck's strip search of Mr. Lee— that qualified immunity was not available to shield an officer from liability on or after that date. *Shain v. Ellison,* 273 F.3d 56 (2d Cir.2001).

Mr. Lee was charged with two misdemeanors and a violation. He was not charged with any crime that suggested that he might be carrying contraband into the OCCF, and in any event, Kehlenbeck testified that he would not have considered the nature of the charges against Lee in making the determination to subject him to a strip search. Therefore, unless other factors indicated that Mr. Lee was at risk for carriage of contraband, CO Kehlenbeck was not privileged to strip search him.

■ I accept that the County Attorney's implicit argument in summation was correct: CO Kehlenbeck might have had probable cause to strip search the defendant, under prevailing legal norms, if he had concluded that a combination of factors—including the defendant's record, his lack of verifiable employment, and the presence on his person of a substantial amount of cash, a beeper and a cell phone—raised the suspicion that Lee was involved in the drug trade, and thus might be carrying contraband on his person. Evidence about such matters may be intro-

---

9. In reaching this conclusion, I specifically DO NOT take into account my personal opinion concerning the veracity of the testimony of CO Kehlenbeck and Sheriff Bigger con-

cerning (1) the alleged differences between a "personal hygiene check" and a strip search, or (2) the non-routine nature of the latter at OCCF.

duced to establish intent to sell narcotics, *People v. Calada,* 154 A.D.2d 700, 546 N.Y.S.2d 681 (2d. Dept.1989), and is therefore relevant to the question of probable cause for an arrest or a strip search.[10]

However, there is no evidence that Kehlenbeck relied on this combination of factors—or any combination of factors, for that matter [11]—in deciding to strip search Lee. Kehlenbeck could not say why he strip searched plaintiff, because he did not know. He had no memory of the incident, though it undeniably took place, because Kehlenbeck filled out a form confirming that he did it. In fact, Kehlenbeck could not even say what he knew about Lee at the time he strip searched the man. Thus, any suggestion that he might have relied on particular factors in deciding to strip search plaintiff—and the County Attorney did make such a suggestion—would inevitably lead to a verdict based on pure juror speculation.

The jury specifically concluded that Kehlenbeck had reason to suspect that Lee was carrying contraband, based on the crime charged, the circumstances of the arrest, or particular characteristics of the arrestee. No evidence whatever supports that conclusion. Kehlenbeck denied that the crime charged or the circumstances of the arrest played a role in his determination to strip search Lee or anyone else—an appalling admission, in view of settled law. And Kehlenbeck could not identify any characteristic of Lee's that led him to conclude that plaintiff might be carrying contraband. In the absence of any evidence tending to prove why Kehlenbeck did what he did, the jurors had to have engaged in impermissible speculation about Kehlenbeck's motives. Speculation will simply not support a verdict.

For this reason, the Court grants the motion for a new trial.

Of course, it should be obvious from the above that, had Lee moved at the close of all the evidence for judgment in his favor (as permitted by Fed. R. Civ. P 50(a)), and then renewed the motion after trial, the Court would have entered judgment notwithstanding the verdict and empaneled a new jury to award damages. The fact that a trial judge cannot weigh the evidence on a motion for j.n.o.v., but must view it most favorably to the prevailing party, has no bearing on the analysis—no evidence is no evidence, no matter how you look at it. Plaintiff failed to move for a directed verdict, however, so I cannot grant judgment notwithstanding the verdict at this time. All I can do is grant a new trial. However, I will afford plaintiff thirty days (and no more) to make a motion for summary judgment. While the motion must comply with Fed.R.Civ.P. 56 and the Local Rule 56.1 of this Court, it can incorporate by reference transcripts of prior testimony—all of which are in chambers—and thus the supporting papers need not be voluminous. If no such motion is timely made, the parties will be contacted with a new trial date. Otherwise, I will decide the summary judgment motion and then set a trial date to determine whatever issues remain.

---

10. It is not altogether clear that a Court writing on a clean slate would perceive the same sinister qualities in cell phones and pagers today, since these devices are now commonly found in the pockets, purses and briefcases of lawyers, doctors, business executives, suburban teenagers, and even Federal judges. But for purposes of this motion, I will not deviate from these and similar holdings.

11. This, of course, made the Assistant County Attorney's summation improper. Unfortunately, no objection was lodged.