Anthony DODGE, Peter A. Machado and Joseph Petriello, individually and on behalf of all other similarly situated, Plaintiffs,

v.

COUNTY OF ORANGE and Sheriff H. Frank Bigger, in his individual and official capacity, Defendants.

Samuel Rango, Jarrod H. Mann and Rocco Manniello, individually and on behalf of all others similarly situated, Plaintiffs,

v.

County of Orange and Sheriff H. Frank Bigger, in his individual and official capacity, Defendants.

Nos. 02 Civ. 769CMMDF, 02 Civ. 8451CMLMS.

United States District Court, S.D. New York.

Jan. 27, 2005.

James Edward Monroe, Dupee, Dupee & Monroe, P.C., Goshen, NY, for Plaintiffs.

Christina Sanabria, County Attorney, County of Orange, Goshen, NY, James M. Fedorchak, Gellert & Cutler, P.C., Poughkeepsie, NY, Robert S. Groban, Epstein Becker & Green, New York City, for Defendants.

DECISION AND ORDER ON PLAINTIFFS' MOTION FOR TO DECERTIFY THE RULE 23(B)(2) CLASS IN THIS ACTION AND CERTIFY A CLASS OR SUBCLASSES UNDER RULE 23(B)(3)

McMAHON, District Judge.

These consolidated actions, brought as class actions, challenge the admissions procedures for newly-arrived inmates at the Orange County Correctional Facility (OCCF). The *Dodge* plaintiffs seek to represent a class consisting of all persons accused of misdemeanors who were strip searched upon their initial arrival at OCCF from January 31, 1999 through August 6, 2002. The *Rango* plaintiffs seek to represent a class consisting of all persons accused of felonies who were strip searched upon their arrival at OCCF during the same period.[1]

*Dodge* has been the subject of considerable litigation before this court, including the certification of a class pursuant to Fed.R.Civ.P. 23(b)(2), *Dodge v. County of Orange,* 208 F.R.D. 79 (S.D.N.Y.2002), and a full trial on the merits of plaintiffs' request for preliminary and permanent injunctive relief against OCCF's policies relating to strip searches upon initial admission to the facility. *Dodge v. County of Orange,* 282 F.Supp.2d 41 (S.D.N.Y.2003). On appeal from this Court's determination after trial, the Second Circuit vacated that judgment and remanded so this court could reconsider the issue of plaintiffs' standing to seek injunctive relief in view of its decision in *Shain v. Ellison,* 356 F.3d 211 (2d Cir.2004)(*Shain II*), which was handed down after the trial of the injunction claims. *Dodge v. County of Orange,* 103 Fed.Appx. 688, 2004 WL 1567870 (2d Cir.2004).

In the wake of *Shain II,* plaintiffs have withdrawn their claim for injunctive relief. They seek decertification of the Rule 23(b)(2) class and certification of a class or classes of plaintiffs pursuant to Rule 23(b)(3). Defendants have no problem decertifying the injunctive class but oppose the motion to certify classes for purposes of recovering damages.

The standards for determining a motion for class certification are well settled and require little discussion. For a court to certify a class under Rule 23(b)(3), it must conclude that the prerequisites to class action status as set forth in Rule 23(a) are met, as well as the standards specific to Rule 23(b)(3) classes. In brief, the court must conclude all of the following:

*Under Rule 23(a):*

(1) the class is so numerous that joinder of all members is impracticable;

---

[1] Plaintiffs originally sought to represent classes of misdemeanor and felony detainees, respectively, from January 31, 1999 through the date of judgment. They have narrowed the class period, apparently in view of certain findings this court made at the trial of their action for preliminary and permanent injunctive relief. *Dodge v. County of Orange,* 282 F.Supp.2d 41, 85–86 (S.D.N.Y. 2003). Those findings are not binding on anyone any more, in view of the Second Circuit's vacatur of that decision, but plaintiffs' counsel appears to have given up the contention that all pre-trial detainees who arrived at OCCF after August 6, 2002 were strip searched pursuant to a uniform policy.

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Under Rule 23(b):*

(1) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and

(2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The following constitute my findings on these issues.

*Rule 23(a)(1): Numerosity*

■ There is no question that the class is so numerous that joinder of all members is impracticable. Defendants do not dispute plaintiff's assertion, using data drawn from the report filed annually by OCCF with the New York State Department of Corrections, that there could be as many as 9,280 members in the Dodge class (misdemeanor admittees) and over 10,000 members in the Rango class (felony admittees).

*Rule 23(a)(2): Commonality/Rule 23(a)(3): Typicality*

■ "The commonality and typicality requirements of Rule 23(a) tend to merge." *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The crux of both requirements is to ensure that the maintenance of a class action is economical, and that the named plaintiffs' claims and the class claims are so inter-related that the interest of the class members will be fairly and adequately protected in their absence. *Pyke v. Cuomo,* 209 F.R.D. 33, 41 (N.D.N.Y. 2002). As such it is appropriate to discuss them together.

The commonality requirement is satisfied if plaintiffs' grievances share a common question of law or fact. It is not necessary that all of the questions raised by arguments are identical; it is sufficient if a single common issue is shared by the class. *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 155 (2d Cir.2001); *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y. 1992); *Fox v. Cheminova, Inc.,* 213 F.R.D. 113, 126 (E.D.N.Y.2003). Or, as this court previously held in this very action, "Rule 23(a)(2) does not require the plaintiffs to demonstrate that the class members' claims are identical; rather, it demands that the disputed issue of law or fact 'occupi[ies] essentially the same degree of centrality to the named plaintiffs' claim as to that of the other members of the proposed class.'" *Dodge v. County of Orange,* 208 F.R.D. 79, 88 (S.D.N.Y.2002).

The typicality requirement is satisfied "if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." *Marisol A. v. Giuliani,* 929 F.Supp. 662, 691 (S.D.N.Y.1996); *Robinson, supra,* 267 F.3d at 155.

■ Notwithstanding defendants' effort to overcomplicate the analysis, there is in fact one issue that is both common to the claims of every proposed class member and central to each of their claims: the existence or non-existence of a policy at the OCCF of strip searching each and every new pre-trial detainee upon arrival at the jail, regardless of the existence of individualized reasonable suspicion that the new arrival was carrying contraband, based on the nature of the crime charged, the circumstances of the arrest, and the particular characteristics of the arrestee. All the members of the *Dodge* class contend that such a policy existed at the time they were admitted to the jail; all the members of the class claim that any such policy is patently illegal under Second Circuit jurisprudence;[2] and all the members of the class claim that they were searched pursuant to

---

2. *Shain v. Ellison,* 273 F.3d 56 (2d Cir. 2001)("*Shain I*"); *Wachtler v. County of Herkimer,* 35 F.3d 77 (2d Cir.1994); *Walsh v. Franco,* 849 F.2d 66 (2d Cir.1988); *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986). I will frequently refer to these four cases together as "*Weber/Walsh/Wachtler/Shain I.*"

the policy, which was uniformly applied to every arriving detainee. That is what the named plaintiffs allege in the *Dodge* complaint; that is what the other members of the proposed class allege.

The same is true of the proposed *Rango* class: the plaintiffs, all newly-arrived detainees accused of felonies, allege that they were strip searched pursuant to an unconstitutional policy of searching all arriving detainees. The principal difference between the *Dodge* and *Rango* classes is that Second Circuit jurisprudence on the strip searching of pretrial detainees accused of felonies is not "settled;" the Court of Appeals has never spoken to the question and, as far as I know, the only court to rule on the question is this one. *See Murcia v. County of Orange*, 226 F.Supp.2d 489, 494 (S.D.N.Y.2002). Since the law on this point cannot be considered "clearly established" as of the time the searches were conducted on the members of the proposed class, qualified immunity is a common defense applicable to Sheriff Bigger as against the *Rango* class members.[3] Indeed, I gave Sheriff Bigger the benefit of qualified immunity in *Murcia* when I concluded that there was no logical reason to treat felony detainees differently than misdemeanor detainees under the reasoning of *Weber, Walsh, Wachtler*, and *Shain I. Murcia, supra*, 226 F.Supp.2d at 494 n. 3.

*Rule 23(a)(4): Adequacy of Representation*

■ In class actions of this sort, the adequacy of representation factor relates chiefly to the ability of class counsel. I am familiar with the work of both Mr. Monroe and Mr. Isseks, generally through their numerous cases on my docket, and specifically through their work on the *Dodge* case, which, as noted above, they took through trial on the application for injunctive relief. There is no question in my mind that they are capable of representing the interests of the class in a more than adequate manner, and defendants do not argue otherwise.

*Rule 23(b)(3) Issues*

The only serious argument here is whether this action can or should be certified as a Rule 23(b)(3) class because of the issues that are particular to (b)(3) classes: whether class-wide issues predominate and whether a class action is superior to other available methods fo the fair and efficient adjudication of the controversy. I conclude that the action should be bifurcated into liability and damages phases, and that two classes, each containing two sub-classes, should be certified, limited to the issue of liability only.

### Predominance

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Amchem Products, Inc., v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The predominance requirement is "more stringent" and "far more demanding" than the commonality requirement of Rule 23(a). *Id.* at 609, 623, 117 S.Ct. 2231.

It makes sense to discuss predominance first in the context of a finding of liability, and then in the context of damages.

■ On the liability side of the equation: Case law suggests that, when a uniformly applied policy is challenged, the validity of the policy predominates over individual issues. That is certainly true in this case. The issue of the existence of a policy at OCCF, the constitutionality of that policy, and whether the policy was uniformly applied (which is a yes/no question) are the predomi-

---

**3.** Plaintiffs allege that this Court's decision in *Murcia* put the County defendants on notice, as of the date of that decision, that the indiscriminate strip searching of newly-arrived felony detainees was unlawful, and that the law, for qualified immunity purposes, was "clearly established." However, the Second Circuit has held that the law cannot be "clearly established" for qualified immunity purposes by district court opinions, but only by the decisions of the applicable circuit court or the Supreme Court. *Shechter v. Comptroller of New York*, 79 F.3d 265, 271 (2d Cir.1996); *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir.1991); *Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir.1987); *Chipperini v. Crandall*, 253 F.Supp.2d 301, 307 (D.Conn.2003).

nant liability issues in the case of every one of these plaintiffs.

In similar circumstances involving facility-wide strip search policies, courts have not hesitated to certify classes. *See e.g., Tardiff v. Knox County*, 365 F.3d 1, 7 (1st Cir.2004)(affirming certification of two 23(b)(3) strip search liability classes); *Calvin v. Sheriff of Will County*, No. 03 C 3086, 2004 WL 1125922, *3–5 (N.D.Ill. May 17, 2004)(certifying 23(b)(3) liability strip search sub-classes); *Blihovde v. St. Croix County, Wisconsin*, 219 F.R.D. 607, 622–23 (W.D.Wis.2003)(certifying 23(b)(3) strip search class); *Maneely v. City of Newburgh*, 208 F.R.D. 69, 78–79 (S.D.N.Y.2002)(certifying 23(b)(3) strip search class as to the issue of whether defendants had an unconstitutional policy).

If the complaint alleged no more than that the plaintiffs were illegally strip searched upon their arrival at OCCF, I would probably agree with defendants that class certification was inappropriate. But that is not what the complaint alleges. It alleges that all the members of the class were strip searched for no reason except that there was a policy of strip searching everyone. That is an entirely different matter.

The defendants identify a number of "individual issues" that they contend are relevant to the question of liability. The only one that requires extended discussion is whether—assuming the existence of a uniform policy uniformly applied as plaintiffs allege—the County could have legally strip searched some class members, because a proper *Weber/Walsh/Wachtler/Shain I* assessment would have revealed some individualized reason to conclude that the arrestee might be carrying contraband. The County contends that each individual class member would have to prove that the County could not have strip searched him or her in a constitutionally compliant manner as a precondition to finding the defendants liable.

I reject this contention. The allegation of the complaint is that everyone was searched pursuant to a uniformly-applied policy. Implicit in that allegation is the notion that no individualized assessments were made for anyone. If individualized assessments were in fact not made, then all the searches were illegal, because each new arrival was constitutionally entitled to an individualized assessment of his or her circumstances. As plaintiff correctly notes, the fact that a particular class member could have been lawfully strip searched if OCCF had made the constitutionally required assessment is a defense to a particular class member's claim for damages, not a defense to the class-wide claim that the County searched everyone without making any assessment at all. *See e.g., In re Visa Check*, 280 F.3d 124, 140–41 (2d Cir.2001), *Maneely v. City of Newburgh*, 208 F.R.D. 69, 77–78 (S.D.N.Y.2002); *Calvin v. Sheriff of Will County*, No. 03 C 3086, 2004 WL 1125922 (N.D.Ill. May 17, 2004); *Mack v. Suffolk County*, 191 F.R.D. 16, 24 (D.Mass. 2000).

None of the other "individual issues" with which, according to the County, this case "bristles," (County Br. At 15) goes to the defendants' liability, either. For example, the date when a particular plaintiff was incarcerated goes to his/her eligibility for membership in the class (or a particular sub-class), and no more disqualifies the case for class treatment than does the fact that particular shareholders in securities litigation sold their stock on different dates. Similarly, whether a particular class member was subjected to an admissions search under more than one policy begs the question, since the allegations is that at all times, there was only one policy—search everyone. And whether a Corrections Officer correctly applied the policy is of no moment here, because the allegation is that everyone who arrived was searched pursuant to a policy of strip searching every pre-trial detainee upon arrival. The only way to apply such a policy incorrectly is to fail to strip search a newly-arrived detainee. A person who was not searched is by definition not a member of any class in either lawsuit.

■ When we turn to damages, however, it is clear that individual issues predominate. Even if the plaintiff class members were strip searched illegally pursuant to a uniform policy, not all arriving inmates will have suffered in the same way or to the same extent. Some may have suffered physical damages as

a result of a strip search. Some may have been severely psychologically damaged. Some, perhaps many, will not have found the experience terribly degrading. And there will undoubtedly be certain defendants—who knows how many?—whose damages may be limited precisely because they could have been legally strip searched if OCCF personnel had simply assessed each new arrival for factors that would render a strip search permissible under Second Circuit jurisprudence.

The question then arises whether "predominance" must exist at every stage of a class action. As defendants acknowledge, the Second Circuit has already held that the presence of individualized damages issues does not, by itself, preclude class certification. *In re Visa Check*, 280 F.3d 124, 140–41 (2d Cir.2001). Defendants argue, in a footnote, that where numerous and significant individualized liability issues combine with individualized damages issues, class certification is not appropriate. But I have rejected defendants' contention that there are numerous and significant individualized liability issues in this case.[4]

I thus conclude that, on the question that underlies imposition of liability in these cases—the existence of a uniform policy—common questions predominate.

Nonetheless, where, as here, individualized questions dominate the issue of damages, it seems to me that a 23(b)(3) class ought be certified only when a class action is the clearly superior method for resolving the case fairly and efficiently. So I turn to the second prong of the 23(b)(3) analysis.

### Superiority

■ Plaintiff urges that a class action is superior to any other method for resolving this case fairly and efficiently. Defendants disagree, and urge the court instead to use this case as a "test case," with an appropriate special verdict form on which a jury will make certain findings, some of which findings (those pertinent to the County's policies) will be binding on the County through principles of former adjudication.

I agree with plaintiffs.

Where a single issue (such as the existence of a uniform policy) is guaranteed to come up time and time again, issues of judicial economy strongly militate in favor of resolving that issue via a technique that will bind as many persons as possible. The County blithely suggests that it would be bound, under principles of former adjudication, by a decision in the test case. But it fails to address the fact that hundreds, perhaps thousands, of individual plaintiffs would have to file motions with the judges of this court to take advantage of a test case ruling, thereby creating a tremendous and wholly unnecessary burden on the court system (not to mention on the tax payers of Orange County).

Moreover, to the extent that principles of former adjudication bind the County with regard to the existence of a policy of strip searching all persons who arrive at OCCF, the County may well already be bound, at least for the period prior to August 2001—not because of the now-vacated findings after trial in *Dodge*, but because of either (1) this Court's decision in *Lee v. Perez*, 175 F.Supp.2d 673 (S.D.N.Y.2001), and/or (2) the County's admission (via the testimony of its own personnel) that such a uniform policy existed prior to August 2001.[5] The issue of

---

**4.** I recognize that Judge Hurley has, on multiple occasions, both before and after *Visa Check* was decided, refused to certify a class in a similar case pending in the Eastern District, *Augustin v. Jablonsky*, 99 Civ. 3126(DRH), 2001 WL 770839 (E.D.N.Y.2001), on the ground that common issues did not predominate. I am not familiar with the record in *Augustin*; perhaps I would have reached the same result on the record before Judge Hurley. Even the same court can reach different conclusions in different cases; for example, I am today declining to certify classes in a companion case involving the strip search policies at the Dutchess County Jail because, on a rather different fact pattern, common questions

do not predominate. See *Franklin v. County of Dutchess*, No. 03 Civ. 719(CM), 225 F.R.D. 487 (S.D.N.Y.2005). But on the record before me—a record I know well—I do not find the reasoning of *Augustin* persuasive in view of *Visa Check* and *Robinson, supra*, and I respectfully decline to follow it.

**5.** The principal reason why defendants wanted to have a quick trial on the merits of plaintiffs' application for permanent injunctive relief was so that, if the Second Circuit reversed itself (or the Supreme Court reversed the Second Circuit) in *Shain v. Ellison*, the jail could "revert" to the

the binding effect of prior decisions or admissions is itself an issue that ought to be resolved once for all, thereby minimizing the risk of inconsistent results.

Finally, the Second Circuit has also endorsed reliance on Rule 23(c)(4)(A), which expressly permits an action to be brought or maintained as a class action with respect to *particular issues*. As the Second Circuit recognized in *Robinson, supra*, "District courts should 'take full advantage of this provision' to certify separate issues 'in order ... to reduce the range of disputed issues' in complex litigation and achieve judicial efficiencies." 267 F.3d at 167–68.

In this case, as was true in *Robinson*, litigating the "existence of a uniform policy" issue for the class as a whole would both reduce the range of issues and promote judicial economy. Every member of the class who did not opt out would be bound by a decision that there was, or was not, a uniform policy in effect during a particular time period. As in *Robinson*, "even assuming that the remedial stage is ultimately resolved on a non-class basis, the issues and evidence relevant to these individual adjudications would be substantially narrowed." *Id.* at 168. For example, a finding that there was a uniform policy in effect during a particular period would establish the eligibility of certain persons to seek damages. A finding of

"no uniform policy" during a particular period, by contrast, would not bar individuals who arrived at OCCF during that period from challenging the particulars of their search in an individual action. It would, however, bar them from asserting that they were searched pursuant to a uniform policy, which would eliminate one contentious issue from those individual actions.

In short, dealing with the question that is common to everyone's claim—the issue of the existence of a uniform strip search policy—on a class-wide basis is a clearly superior method of resolving that key question.[6]

Because common questions predominate on the issues of liability but not individualized issues underlie any award of damages to class members, I am bifurcating the liability and remedy phases of these actions and I certify classes only on the issue of liability—with liability defined as the plaintiffs allege it, namely, that the class members were searched solely on the basis of the uniform policy and without any consideration of their individual circumstances.

To the County defendants' suggestion that certifying a liability-only class will somehow impinge on their right to a jury: that is, with respect, absurd. If there are disputed issues of material fact concerning the existence of a uniform policy, they will be tried to a jury.[7]

policy of strip searching every new arrival, regardless of his individualized circumstances. OCCF officials were eager to strip search every new arrival for what they claimed were security reasons. *See* Trial Transcript, Testimony of Captain Joseph G. Ryan, at 106–07; 115–16. It will be difficult if not impossible for the County to retreat from its prior position on the existence of a uniform strip search policy at the "old" OCCF, even though the findings made after the *Dodge* trial are no longer binding.

6. As a purely practical matter, I must observe that, if thousands of individual plaintiffs brought individual actions in this court ab initio, those actions would likely be assigned to me as "related cases," and I would consolidate them for the purpose of determining liability.

7. I recognize that I cannot resolve merits issues as part of a decision on a motion for summary judgment. However, this case carries a lot of "merits" history. Plaintiffs have already announced that they intend to move for summary judgment on the "existence of a policy" issue. Given the facts known to this court, it would be

foolish not to acknowledge that plaintiff might well prevail on such a motion for the pre-August 2001 period—even if *Lee* does not collaterally estop the County and Bigger from relitigating the issue. Defendants could just as easily have prevailed on such a motion for the period from and after August 2002 had plaintiffs not withdrawn their proposal to certify a class for that period.

I imagine that the parties will move for cross-motion for summary judgment on the existence of a policy issue for the year between August 2001 and August 2002. I cannot stop anyone from making such a motion, but let me suggest that summary judgment will not be an appropriate vehicle for resolving the question. In this regard, I remind the parties that *Dodge I* findings concerning the interim year were not based on undisputed facts. Many facts concerning the existence or non-existence of a policy from August 2001–August 2002 were in dispute, and I resolved them by making, *inter alia*, credibility findings. Now that we are dealing only with an action for damages, I will not be the fact-finder and I would not be in a position to make credibility assessments or resolve evidentiary conflicts

If in fact there was a uniform policy in effect during a particular time period, none of the issues raised by defendants that might impinge on the legality of the search will be triable. And as I promised counsel for the County at our first conference long ago, all issues triable to a jury concerning each individual class member's damages will of course be tried to a jury if they cannot be settled.[8]

*Classes to be Decertified*

Since plaintiffs have abandoned their claims for any injunctive relief, I hereby decertify the classes previously certified in *Dodge* pursuant to Rule 23(b)(2).

*Classes to be Certified*

I hereby certify classes, pursuant to Rules 23(b)(3) and (c)(4), classes in each of the *Dodge* and *Rango* actions, limited to the issue of liability under an alleged uniform policy of strip searching all new arrivals at the OCCF.

The *Dodge* class consists of all persons who were detained on misdemeanor charges and who were strip searched on their initial arrival at OCCF pursuant to the facility's alleged policy of strip searching all newly-arrived pre-trial detainees without making any individualized assessment of the likelihood that they would be carrying contraband, using the factors identified by the Second Circuit in *Weber/Walsh/Wachtler/Shain I*.

The *Rango* class consists of all persons who were detained on felony charges and who were strip searched on their initial arrival at OCCF pursuant to the facility's alleged policy of strip searching all newly-arrived pre-trial detainees without making any individualized assessment of the likelihood that they would be carrying contraband, using the factors identified by the Second Circuit in *Weber/Walsh/Wachtler/Shain I*.

The *Dodge* and *Rango* plaintiffs need to be in separate classes, because of both the potential that a different legal standard may be applicable to strip searches of felony and misdemeanor detainees and the likelihood that *Rango* will end up being dismissed as to Sheriff Bigger on the basis of qualified immunity. Some individuals may belong to both classes, but that is of no moment. The cases have been consolidated because virtually all of the evidence will be identical, but that does not suggest merging the two groups.

Within the two general classes in each case, there should be two sub-classes: a class of persons who were strip-searched on arrival at OCCF between January 31, 1999 and August 1, 2001, and a class of persons who were strip-searched on arrival at OCCF between August 1, 2001 and August 6, 2002. The first subclass covers the period when OCCF was in its old facility and for which there are arguable issues of former adjudication and party admissions. The second begins with the move to the new OCCF and ends with the entry of the short-lived preliminary injunction in *Dodge*, which resulted in changes in the official policies at OCCF.[9]

*Notice to the Class*

Rule 23(c)(2) provides that, in any class action maintained under Rule 23(b)(3), notice shall be given to the class in the best practicable manner. As required by the rule, the notice shall advise each potential class member that he/she can choose to opt out of the class; that the judgment, whether favorable

should they emerge from the record on a motion for summary judgment. If the record on such a motion is no different from the trial record, there is no question that there will be disputed issues of fact, which will be tried to a jury. Moreover, that jury will not be made aware of how the court ruled on those same issues after the first trial.

8. In what the court interprets as an attempt to intimidate me from concluding that there are ways to manage issue-oriented class certification, the County has intimated that it would not consent to have damages inquests for class members held before one of our excellent magistrate

judges. That, of course, is the County's right. Fortunately, there are many other ways of handling such matters. For example, if the County's liability were established because the trier of fact concluded that a uniform policy existed, I could appoint an out-of-district Article III judge whose docket is not overcrowded to serve as a special master. That judge could then travel to New York—at the defendants' expense, of course—to supervise the damages trials.

9. The fact that the parties treated these two periods differently during the *Dodge I* trial is a persuasive reason for dividing the classes in this fashion.

or not, will bind all members who do not choose to opt out; and that individual class members who do not request inclusion may, if they so desire, enter an appearance through counsel.

Plaintiffs propose to send a letter by first class mail to each individual who was admitted to OCCF as a pre-trial detainee between January 31, 1999 and August 6, 2002, advising that individual of the status of the case and giving the statutorily required information. Plaintiffs also propose to give notice by publication on four consecutive weekends in five newspapers that serve the Orange County region: *The Times Herald Record, El Diario, The Wallkill Valley Times, The Warwick Advertiser,* and *The Port Jervis Gazette.* Plaintiffs do not attach a copy of a proposed letter or advertisement, and do not suggest a deadline by which class members have to opt out. Defendants ask that the letter include a statement that there will be individuals who were strip searched who will not be able to recover any damages—an intimidating remark that will not appear in any letter sanctioned by this court. However, clearly the notice letter needs to advise each potential class member that the issue of damages, if it cannot be settled, will be litigated before a judge and a jury on a case-by-case basis, and that different members of the class may receive different amounts of damages as a result.

The manner of giving notice is acceptable to the Court. However, plaintiffs' counsel needs to present the Court and defendants' counsel with the text of a proposed notice letter and advertisement. Counsel shall submit same within ten days of the date of this decision. Defendants' counsel shall have ten days thereafter to offer any substantive or stylistic comments it wishes to make to the letter.

Within ten days, the County defendants are directed to supply class counsel with a computerized listing of the names and addresses of each individual admitted to OCCF between January 31, 1999 and August 6, 2002.

The cost of giving notice rests with plaintiff's counsel unless otherwise agreed by the parties.

This constitutes the decision and order of the Court.